## MAGEE v. O'NEILL.

1. Whether a child has been reared in the faith of the Roman Catholic Church is an inquiry susceptible of judicial ascertainment.

2. A testator bequeathed a fund to trustees, the income whereof was to be appropriated to the maintenance and education of his granddaughter, then an infant, "provided she is educated in some Roman Catholic female seminary, or school, and is raised as a Roman Catholic, in the faith and communion of her deceased father," the whole amount to be paid to her at her majority or marriage, freed from all trusts; but, if she "is not educated in a Catholic seminary or school, or raised as a Roman Catholic, in the faith of the Roman Catholic Church, then" to testator's daughters. *Held,* that the words here used created a conditional limitation.

3. Neither the inadequacy of the interest to defray the expenses of an education at such a school, nor the infancy of the granddaughter, rendered the condition so impossible as to defeat the conditions imposed.

4. A sum out of this fund having been offered by the trustees to the mother to maintain her daughter at a Roman Catholic school for some months, and declined, the condition cannot be disregarded upon the ground that it could not be performed, at least in part, however limited the mother's own means may have been.

5. The condition was not void, as being in contravention of public policy.

6. The constitutional provisions which prohibit the establishment of any one denomination of Christians protect each and all in the peaceable enjoyment of its own mode of worship; instead of renouncing all religious denominations, they protect all.

7. The granddaughter not having been educated in a Roman Catholic school, or raised as a Roman Catholic, in the faith of the Roman Catholic Church, the fund, at her majority, became vested in testator's daughters, under the terms of his will.

Before HUDSON, J., Charleston, December, 1881.

The Circuit decree in this case, omitting its statement of facts, which are fully set out in the opinion of this court, was as follows:

In the second of the exceptions, according to the order in which they are stated, and in which it is said that there is error in the conclusion of law, that it cannot be judicially ascertained whether Mrs. Magee (the plaintiff) was or not reared in the faith of the Roman Catholic Church, the judgment of the court is that in this there was error, and the exception is sustained.

The remaining exceptions are that the conclusions of law are error when they declare that the conditions already stated are to be held as subsequent, and that the testator intended to create them as conditions precedent; that the referee erred in his conclusion that the estate or interest in the legacy is to be construed as if no such conditions had been attached thereto; that the conditions set forth in the will had never been fulfilled, and the legacy never vested; that if considered as conditions subsequent, they have never been and cannot now be complied with; and that the estate limited over upon the fulfillment of the condition, the evidence being that the condition has not and cannot be now fulfilled, takes effect.

These, then, are the questions upon which the judgment of this court is asked and now stated. Are these conditions to be considered as conditions precedent or subsequent, and, in either view, to be considered as conditions which this court will enforce, either to require performance before vesting the legacy, or subsequent to divest it, if not performed. And the judgment of the court is that upon the point whether they will be considered as conditions subsequent or precedent, they must be held as conditions subsequent; and next, that they are inoperative as conditions subsequent to divest the interest in the legacy. The non-performance of them cannot affect the right of Elizabeth Magee (now Harris) to the legacy in question.

It must be presumed that the relationship which existed between the testator and this infant of very tender years would prompt him to make the provision he did, as a bounty to her, who stood in that close connection of the only child of his deceased and only son. It would not be consistent with any natural feeling that another motive should either prompt or control him in what he did. He gives it to be appropriated " to the maintenance and education of my grandchild, Elizabeth

Magee, the daughter of my deceased son." She was then not yet three years of age. Her "maintenance" was to be provided for, and that "maintenance," under any circumstances, he intended to be provided for; but her age required provision for her "maintenance" before her education could commence. And provision for that "maintenance" can only be carried out if the interest in the legacy was vested at the death of the testator.

The application of the income to her "maintenance" was, at least, as positive as that relating to her "education"—under the circumstances it was more pressing, and could only be fulfilled if the interest in the legacy was vested. Her education might be postponed for years, but the obligation of the testator to his grandchild was recognized by him in the provision for her maintenance. To affirm that, no matter how severe and pressing might be or was the need for applying this income to maintenance, it should be deferred until the need for education should arrive, would be to reject the motive which, it may be well supposed, prompted the provision, and subject it to a motive which would be hard and cruel.

In this case it will be seen that the position of the testator's estate, which he intends for the benefit of his granddaughter, is distinctly separated from the rest of his estate. "One-twentieth part" is so set apart and given to these trustees for the "maintenance and education" of his grandchild, the plaintiff. The severance is not postponed; it is at once done, and the purpose of that severance is at once declared to be for the "maintenance and education" of a child, then of very tender years; and one, the most immediately present of these declared purposes for which this provision had been made, was in its nature such that it would require the interest to be vested in order that the purpose might be accomplished. Without extending further this part of the case, by reference to the decisions cited in argument to support it, it is the judgment of the court that the conditions set forth in the will of John Magee, connected with this legacy to the plaintiff, are conditions subsequent, and the exceptions are on this point overruled.

The nature and effect of these conditions, because of non-fulfillment, to divest that interest, will now be considered. The

question of performance of these conditions as subsequent, and, if valid as such, divesting an interest vested, may be considered in two views: First. Can the plaintiff, Elizabeth Magee, now Harris, be required to forfeit her interest because they have not been complied with or performed? Second. Are they such conditions as will be recognized as proper to be enforced?

The testimony of the trustees is very explicit on this point that the provision made for the grandchild did not admit in itself of the performance of the condition. In the reply to the letter of the mother, the trustees plainly state that the income was not sufficient to admit that to be done which it is contended should be done, or, if not done, that this legacy shall be lost to the plaintiff. That compliance, therefore, with the conditions was impossible, because the provision made for it was wholly inadequate, is simply to state the proposition that a bequest which is valid and was vested may be divested because of that not being done which the testator himself made impossible of performance. In a case *inter vivos* a donor or grantor could not claim to have a gift or grant in the enjoyment of the donee or grantee avoided, because of the omission to do that the doing of which had been rendered impossible by the act of such donor or grantor. And the rule would apply as well to a bequest or devise, and operate on those who, by deed or will, claim under the donor, grantor or devisor.

But there are objections to the enforcement of these conditions to divest the interest of the plaintiff so strong that they cannot but prevail. The mother of this child, the surviving parent, is not attached to the faith of the Roman Catholic Church. She is a member of a church entertaining religious views which differ widely from those inculcated in the Roman Catholic Church. She cannot be the proper person to rear her child in the belief of the Roman Catholic Church. With her religious opinions it may well be assumed that to undertake such a duty would be a very great wrong. To rear this child as she then was in the faith of the Roman Catholic Church would involve the separation of the child from the mother; the custody and care to be taken from the mother and transferred to those whose religious faith was that in which it is said this child was

intended to be reared. And this, then, is the separation of the child from the mother—the relinquishment of the highest duty which is connected with the domestic relations, and the parting asunder of ties than which none are stronger or even more sacred in human life.

In the consideration of this part of the case, it would be only necessary to change the terms of this condition, and suppose that this was the child of a mother who was a member of the Roman Catholic Church, and the condition annexed to a legacy like this was that the child should turn from the care and religious teachings of its mother, from attending religious worship ·with its mother, and conform itself to other teachings wholly different from its mother's; that involving a separation in all things from its mother, would it not be considered as the greatest of wrongs to that mother and that child? It is only necessary to state the case to show that the same rule which here it is sought to enforce against this plaintiff, applied to persons who prefer any other religious belief, would in that case, as in this, violate those domestic relations which the law maintains and protects in their most perfect development.

If a condition in restraint of marriage, or that a wife shall live separate from her husband, or that a legacy be used to promote ambitious views or purchase official position, or, as in many other instances which may be cited, affect the public policy, and are held void—in which of them is to be found that which more violates public policy than is the condition in a case like this, where violence is done to the conscience alike of the mother and the child; where it breaks the ties which the. great interests of humanity require should be carefully cherished, and tends to disturb, if not overthrow, the foundation on which society rests? That public policy which is seriously affected in a case like this is not the opinion of one or more men as to a particular question, social, political or religious, but that sense of public welfare which is derived from the preservation in all their force of the institutions upon which rest the whole fabric of society as it exists with us.

It is not the circumstances of this particular case which should guide us in our judgment. It is the principle that is involved,

and in which the living and their posterity are deeply concerned. If this testator can annex such a condition to this gift to a grand-child, then to all parents is extended the legal right to deal likewise with their children, whether infants or adults. To every bequest and devise can be annexed this frightful condition: That the same shall be void unless the legatee, if an infant, shall be reared in a specified religious faith, or, if an adult, shall renounce a deeply-rooted faith, and adopt the religion of the testator. Could a policy be conceived better calculated to disrupt domestic ties and sow the seeds of family feud and religious hypocrisy? Yet are we asked to announce from this tribunal that an American court solemnly sanctions so frightful a power in testators and to decree it consistent with public welfare, public policy and the genius and spirit of our laws.

Nor is this in any wise to curtail the powers which one has, to exercise his will in the disposition of that which belongs to him; for that will is ever to be measured by that power, and that must be consistent with the general welfare. The law under which the power to give, grant or devise is given, is a part of the system which is, in all its parts, created to promote the general welfare. Nor can it be better expressed than in the language of the eminent judge cited in the argument: " No man can leave his property clogged and conditioned by his own personal views of public affairs, or by his posthumous ambition (if I may so call it); he cannot make his political opinions run (like a covenant) with his land. He may leave it to whom he pleases, but it must be unfettered by any condition bearing upon matters connected with the public welfare." *Egerton* v. *Brown-low,* 4 *H. L. Cas.* 149.

Conspicuously in the constitution of the United States and of this State is the positive inhibition of all control over religious opinions, and the protection given to the enjoyment of it is forcibly and plainly expressed. " Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof," is the language of the constitution of the United States. The language of the constitution of this State is, if possible, even more emphatic: " No person shall be deprived of the right to worship God according to the dictates

of his own conscience. No form of religion shall be established by law; but it shall be the duty of the general assembly to protect every religious denomination in the peaceable enjoyment of its own mode of worship." If the power to control the conscience in matters of religious belief is thus renounced by the government, Federal as well as State, it is thus the highest and most authoritative exposition of what is in this connection regarded as the public welfare.

Will it then be claimed that this power, which is so renounced, because conducive to the public welfare, can be, nevertheless, exercised by an individual? Can he make that the condition of a gift, which the government could not do? Does not this great provision of the organic law enter into and qualify the exercise of the power of disposition which belongs to the owner of property? He cannot do that indirectly which he cannot do directly. He cannot, by a temptation held out to the ambition, the cupidity, or, perhaps, more than all, the wants and necessities of another, do that which the government has said shall not be done by itself. If the protection of religious belief be essential to the permanency of good government; if religious belief to be honest and deserving of being so called, must be the result of the free, untrammeled, unbought exercise of the faculties given to us, he who forces, trammels or buys for himself, no matter for what purpose, the control of the religious belief of another, in that violates the law which declares that "No person shall be deprived of the right to worship God according to the dictates of his own conscience."

The exceptions to the report, if the conditions are to be considered as subsequent, are overruled. But whether these conditions be precedent or subsequent, holding them void, because against public policy, they would be as ineffectual to prevent this legacy from vesting, as to divest it if previously vested. "When a condition is bad on grounds of public policy, it must be obviously bad whether it be precedent or subsequent. The law will no more allow any thing contrary to public policy to be made the means whereby a party shall entitle himself to an estate, than whereby he shall be made to lose that of which he is already in possession." *Cooke* v. *Turner*, 15 *Mees & W.* 726.

"And this rule is specially recognized when the condition relates to personal property, as in this case." 1 *Story Eq.*, § 289. If the legacy be of personal estate, under the like circumstances, (that is, of illegal condition,) the legacy will be held good and absolute as if no conditions whatever had been annexed to it.

The judgment of the court is that the plaintiff is entitled to the legacy given under the will of John Magee; that she took therein a vested interest; that the condition annexed is a condition subsequent; that the non-performance thereof does not affect her interest, because its subsequent non-performance, if it be valid, was owing to no fault of the infant nor of those having control of the income and of her education, as we have before stated, but chiefly because the condition is void and inoperative as against public policy, and that the legacy, with the accumulation of the interest thereon, be paid over to the plaintiff by the special depositaries with whom it has been placed, under and subject to the order of this court.

*Messrs. Simonton & Barker*, for appellants.

*Mr. A. G. Magrath*, contra, cited 37 *Eng. Com. L. Rep.* 437; 7 *Cl. & F.* 509; 4 *H. L. Cas.* 1; 7 *Id.* 707; 15 *Mees. & W.* 727; 8 *Rich. Eq.* 241; 2 *DeG. & S.* 49; 1 *Eden* 140; 2 *Redf. Wills* 673; 2 *Wms. Ex.* 1110, 1119, 1124; 3 *Myl. & K.* 411; 1 *Story Eq. Jur.* 288 *et seq.*; 3 *Atk.* 332; 2 *Vern.* 416; 11 *Gratt.* 804.

April 17th, 1883. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. John Magee, of Charleston, by a clause of his will, devised as follows: "*Item.* I bequeath one-twentieth part of the remaining collections and proceeds arising from the debts collected and the sales of all my personal property and real estate to my friends John F. O'Neill and Thomas O'Brien, to them and their heirs, *in trust*, to invest the same in property yielding a certain interest, which said income or interest shall be appropriated to the maintenance and education of my grandchild Elizabeth Magee, daughter of my deceased son, the

M

late Captain Arthur Magee, until her day of marriage or when she attains the age of twenty-one years, *provided she is educated in some Roman Catholic female seminary or school, and is reared as a Roman Catholic in the communion and faith of her deceased father, the said Arthur Magee;* and on her day of marriage, or attaining the age of twenty-one years, the bequest—the whole amount—shall be paid over to her and her heirs, forever freed from all trusts whatever. But if the said Elizabeth Magee is not educated at a Catholic seminary or school, and reared as a Roman Catholic in the faith of the Roman Catholic Church, then it is my intention, will and direction that the bequest shall accumulate, the interest or income as it arises shall be added to the principal until the said Elizabeth Magee's death or marriage or attaining the age of twenty-one years, when, on the happening of either of these events, the whole amount—principal and interest—shall be divided and paid over to the trustees of my daughter Elizabeth West, the wife of Preston West, and Mary Brown, the wife of Isaac Brown," &c., and then specifying the limitations and conditions to which the said property should be subject.

When the said Elizabeth Magee arrived at the age of twenty-one years (she is now the wife of J. E. Harris), she filed the complaint in this case against the trustees named in the will, asking that they should account for the said bequest, with the accumulated interest, and upon that accounting pay over the same to her under the will of her grandfather, John Magee. The trustees of Elizabeth West and her children, and of Mary Brown and her children, were also made parties, and they all answered, claiming that the bequest should be paid to them, for the reason that the express terms and conditions upon which the legacy had been given to the trustees for the plaintiff had not been complied with—that Elizabeth Magee was not " *educated at a Roman Catholic female seminary or school, and reared as a Roman Catholic in the faith of the Roman Catholic Church,*" as expressly provided by the will.

The cause was referred to Isaac Hayne, Esq., as special referee to take the testimony and report on the law and facts involved in the case, who took the testimony and reported among other

things as follows: " That when the said Elizabeth Magee was about four years old, and while her father was still alive, she was baptized in the Roman Catholic Church, but she had not been ' educated at a Roman Catholic seminary or school,' and the evidence does not establish that she was ' reared in the faith of the Roman Catholic Church.' That nothing was said or done either by her mother or the said trustees prior to the year 1869 in regard to appropriating the interest and income of the trust estate to the maintenance and education of the said Elizabeth Magee. About that time Mrs. Magee (the widow of Arthur Magee), who was then living with her daughter at Greenville, S. C., applied to the trustees and requested them to assist her from the trust estate in the education of her daughter. Mr. O'Neill referred her to Mr. O'Brien, who stated that the interest and income of the estate was inadequate to maintain and educate Miss Magee at a Roman Catholic institute or school. He· proposed, however, that Mrs. Magee should furnish Miss Magee with the necessary clothing and defray her traveling.expenses in going to such an institution or school (there being no such school located in Greenville), and that the trustees should then pay her expenses at the institute or school for a limited period, say for about six months. This, he said, was as much as the trustees could undertake to do, in view of the small income which the trust estate yielded," &c.

And the referee concluded his report as follows: " It would seem, then, that the continuance of the estate, bequeathed to Miss Magee, having been made to depend upon a condition which is, in its nature, too vague and uncertain to be made the subject of judicial investigation, the condition is void for uncertainty, my conclusion being that it cannot be judicially ascertained whether Miss Magee was or was not ' reared in the faith of the Roman Catholic Church '; and, further,.that she cannot be deprived of her legacy, unless the court shall decide that this condition, as well as the condition which required her to be ' educated at a Roman Catholic school,' has or has not been performed. I report, as my conclusion of law, that her estate and interest in the legacy continues as if no such condition had been attached

thereto, and that she is entitled to have the trust estate hereinbefore mentioned transferred and paid over to her absolutely."

Exceptions were filed to this report, and the cause came on to be heard by Judge Hudson, who decided that the plaintiff was entitled to the legacy given under the will of John Magee; that she took therein a vested interest, that the condition annexed is a condition subsequent, that the non-performance thereof does not affect her interest, because its subsequent non-performance, if it be valid, was owing to no fault of the infant, nor of those having control of the income and of her education, as we have before stated, but chiefly because the condition is void and inoperative as against public policy; and that the legacy, with the accumulation of the interest thereon, be paid over to the plaintiff by the special depositaries with whom it has been placed under and subject to the order of the court.

From this decree the defendants appeal to this court upon the following grounds:

1. "That his Honor was mistaken in his apprehension of the testimony as to the attitude of the trustees to the plaintiff and her mother, and of their reply to her application in 1869; neither of the trustees, in their written reply, having stated that the fund was not sufficient to maintain her at a Roman Catholic school for more than six months.

2. "That the statements of Mrs. Magee bore on their face the evidence of bias, and were wholly insufficient to support or justify any conclusion of fact in the case.

3. "That his Honor erred in holding that 'the testimony of the trustees is very explicit on this point: that the provision made for the grandchild did not admit, in itself, of the performance of the condition, and that, in reply to the letter of the mother, the trustees plainly state that the income was not sufficient to admit that to be done which, it is contended, should have been done, or, if not done, that the legacy should be lost to the plaintiff.' That, on the contrary, the letter of Mr. O'Brien shows that the fund had increased from $1,500 to $4,000 in 1869, and says not a word of its insufficiency.

4. "That his Honor erred in holding that 'compliance with the conditions was impossible, because the provision made for it

was wholly inadequate,' and that the testator himself made the conditions of the will impossible of performance.

5. "That his Honor erred in holding that the plaintiff took in the legacy under the will a vested interest, and that, as a consequence, the conditions attached were, in their nature, subsequent and not precedent.

6. "That his Honor erred in holding that the conditions of the bequest are void as against public policy.

7. "That his Honor erred in holding that the condition annexed is a condition subsequent, and that the non-performance thereof does not affect her interest because the condition is void and inoperative as against public policy."

The Circuit judge held that the referee committed error in deciding as matter of law, that "it could not be judicially ascertained whether Elizabeth Magee, the plaintiff, was not reared in the faith of the Roman Catholic Church ;" and in this we concur with the Circuit judge. We think the phrase alluded to in the testator's will meant no more than that Elizabeth should be reared within the circle and under the influences of the Roman Catholic Church, in which she had already been baptized, and that was susceptible of proof like any other fact. So that it is clear that the proviso in the will of her grandfather was not carried out, and the only question is one of law, whether, under all the circumstances of the case, the court will adjudge the plaintiff, notwithstanding the condition in the will was not performed, to be entitled to the legacy, or that it goes over to the defendants, her aunts, by way of substitution or limitation.

As the legacy was not given directly to Elizabeth, but to trustees with directions to pay it over to her " on the day of her marriage or attaining the age of twenty-one years," provided certain conditions were complied with, it is insisted that she had no vested interest in the legacy, but it remained contingent until the time arrived for its payment, and as a consequence that the conditions which were imposed were conditions precedent in their character, and their non-performance, from any cause whatever, prevented the interest in the legacy from ever attaching. All the authorities agree that conditions precedent must be strictly

construed, and that nothing vests until the thing happens, whether it be possible or impossible, legal or illegal, or in conformity to public policy or against it. And in this regard we confess that we do not clearly see the distinction contended for between this case and that of *Drayton* v. *Grimke, Rich. Eq. Cas.* 321, where it was held that a bequest to two grandsons " on their arrival at the age of twenty-one years and assuming testator's name at that period," was held to be contingent, and that the grandsons were not entitled to the profits arising before compliance with the conditions.

But, as in this case, the income was appropriated for "maintenance" as well as education of the legatee, the necessity for which might precede the time for the performance of the condition as to education, and as our view makes it unnecessary, we will not go into the refined and somewhat artificial learning upon the subject of conditions precedent and subsequent, but consider the case as one in which an equitable interest vested, subject to be defeated by the non-performance of the condition imposed. Still the plaintiff cannot recover without showing performance of the condition, if it was possible to be performed and not objectionable in itself as being against law or public policy. There is a limitation over upon failure of the condition, and in such case the rule is that the testator shall be held to mean precisely what he says—that the words will not be considered as creating a technical condition, but rather what is called a conditional limitation. " But in regard to estates over, dependent upon the non-performance of conditions subsequent, where it is expressly provided that the estate shall go over upon the failure of the conditions, the donor is held to mean precisely what he declares, and the estate over takes effect." 2 *Redf. Wills,* § 66 and *notes;* 2 *Jarm. Wills* (5 *Am. Ed.*) 527 ; *Fox* v. *Phelps,* 20 *Wend.* 437 ; *Finlay* v. *King's Lessee,* 3 *Peters* 346 ; *Newell* v. *Nichols,* 75 *N. Y.* 78 ; 1 *Rop. Leg.* 750.

In the first place, it is urged that the condition was impossible, and, therefore, should be disregarded. It was certainly not impossible in the sense in which that term is usually applied to conditions. " In the view of the common law a condition is said to be impossible only when it cannot, by any human means, take

effect." 2 *Story Eq.* 1304. But we gather that the term " impossible" is used here in another sense, viz.: that the thing required was not to be done by the beneficiary herself, who was an infant, but by her mother or those who had charge of her education, and the bequest itself did not give the means of obtaining the education required; and that such inadequacy made it impossible, and was caused by the testator himself. We do not take the view that the bequest was given for the purpose of educating the grandchild. It seems to us that the condition as to the manner in which she should be educated was independent of the source from which the means were to be derived. It will be observed that the *corpus* was not to be paid to Elizabeth until she attained her majority, at which time, in the ordinary course of events, it was probable her education would be completed.

The whole tenor of the will shows that the testator did not intend the trustees to take charge of his granddaughter and send her to school, providing the means to do so out of the legacy. He attached the condition and left it to the mother to do as she pleased—to act in regard to the education of her daughter in such way as to secure or renounce the legacy. It is true that he directed the income which might arise from the "one-twentieth part" of his estate (which turned out to be $1,500) to be appropriated to the "maintenance and education" of his grandchild, but he did not thereby undertake that such interest would be sufficient for that purpose, or mean anything more than to supplement the means of the mother, and even this assistance was only to be rendered on condition that the child was to be sent to a Catholic school; and, if not so sent, the interest was to be then retained and accumulate, as clearly appears in the limitation over. " But, if the said Elizabeth Magee is not educated in a Catholic seminary or school, or reared as a Roman Catholic, in the faith of the Roman Catholic Church, then it is my intention, will and direction, that this bequest shall accumulate, the interest or income, as it shall be, added to the principal until the said Elizabeth Magee's death or marriage, &c., when, on the happening of either of these events, the whole amount, principal and interest," &c., to go over.

Taking this to be the proper construction of the will, it is still

suggested that the condition was "impossible" from the fact that Mrs. Magee, the mother, was unable, pecuniarily, to send her daughter away from home to a Catholic school. The rule is, that he who affirms must prove, and we do not see satisfactory evidence of the fact; but, passing that, it certainly does appear that Mrs. Magee could have utilized the interest in the hands of the trustees for that purpose, which would have been, at least, part performance, and, as suggested by one of the trustees, might have been taken as full performance. "When a literal compliance with the conditions becomes impossible, from unavoidable circumstances, and without any default of the party, it is sufficient that it is complied with as nearly as it practically can be, or, as it is technically called, *cy pres.*" 1 *Story Eq.* 291.

Mrs. Magee removed from Charleston to Greenville, where there was no Catholic female seminary, and, knowing the terms of the will, made no application for interest or income except on one occasion, when she wrote to the trustees, asking assistance in the education of her daughter, not to send her, however, to a Catholic school, but to one at home of a different faith. The trustees assented to the use of the interest for the purpose of her education, but interposing the known condition that she should be sent to a Catholic school. Mrs. Magee testified, "That when Mr. O'Brien made the proposition above referred to, in 1869, he merely said that the fund was not sufficient to do more than has been stated for a period of six months. In that conversation Mr. O'Brien said that he was anxious that Miss Magee should get the legacy, and that carrying out the plan suggested it would give the trustees a pretext for turning over the fund to her, that he did not propose to educate her," &c. In the delicate position in which they were placed, the trustees seem to have done their whole duty, and they have accounted and been discharged, leaving the fund for whoever may be decided to be entitled to it. Nothing more was heard of a desire to receive the interest, and we cannot resist the conclusion that it was declined on the condition of sending Elizabeth to a Catholic school, either in aid of her own means, or for the limited portion of the year the amount authorized. So that the condition cannot be disregarded upon

the ground that it could not be performed in whole or at least in part.

But, assuming this to be so, it is urged that the condition itself was void as being in contravention of public policy. The phrase " public policy " is very vague, and we are not sure that we clearly understand what is meant by it, as propounding a rule for judicial action in deciding the rights of property. It is the duty of the legislature to make laws and of the court to expound them, but it is not so clearly perceived what is the duty of the court when there is no law to be expounded, and the court is called upon to declare one. It is true that there are certain matters which courts, by decisions often repeated, have declared void as against public policy, such as contracts in restraint of trade, against marriage generally, marriage brokage bonds, gambling debts, &c.; but it seems to us that the subjects in which the court undertakes to make the law by mere declaration, should not be increased in number without the clearest reasons and the most pressing necessity.

We agree entirely with the authorities on the subject which point out the danger of relying on general notions of public expediency or policy, which, from time to time, may vary so much. As to that public policy which is within the cognizance of courts, we cannot conceive of a better definition than that given by a distinguished English judge, viz.: " It cannot be the mere opinion of the judge upon any general question of public policy, or, in other words, whether the judges think that the interests of the public would be better advanced by tolerating or refusing to tolerate such provisos, but whether they are in contravention of any established law, or in contravention of the spirit, though not against the letter of the law." This definition approaches something like clearness, and is in conformity, as we conceive, with our decisions in *Willis* v. *Jolliffe*, 11 *Rich. Eq.* 447; *Dudley* v. *Odom*, 5 *S. C.* 136.

It is not claimed that this condition is in contravention of any established law. We know of none which prohibits a citizen from using his own means in educating a grandchild, and, in doing so, to make his own choice of a school, and have the education given under particular influences, religious or otherwise. We have no

hierarchy—no particular form of religious worship made lawful, and, thereby, all others made unlawful. The State knows no religious denominations further than to protect them in their rights. The members of all, as well as those who are members of none, are equally her citizens, and she has enacted no law forbidding education under the forms and influence of any of them.

The law undoubtedly is, that any person of sound mind and of full age may, by his last will and testament, duly executed, dispose of the whole or any part of his estate at his own will and pleasure, except in two or three cases specially mentioned. Our books are full of authority for saying that, for many reasons, it is regarded important to maintain in its full integrity the right which belongs to a testator to dispose of his property as he pleases, provided only his disposition is not in violation of law. This right is secured alike to every citizen, whatever is his religious faith, be he Jew or Gentile, Protestant or Catholic. This testator exercised that right, and there is certainly no express law which requires us to declare any part of his will void.

But was the condition in this will as to the manner in which the legatees should be reared and educated, in contravention of the spirit of our law? As we understand the argument, the precise point is that, as we have no form of religious worship established by law, but the constitution declares that " No person shall be deprived of the right to worship God according to the dictates of his own conscience," any requirement attached to a bequest that the legatee shall be educated and reared at a school and under the influence of a particular denomination of Christians, is in violation of the perfect liberty of conscience vouchsafed to all; and there being no express law upon the subject, the court should declare it void as against public policy. Presented in this form it is certainly a new question in this State, if not in the United States, and one, in some aspects, not without difficulty.

The constitution does declare in the bill of rights, section 9, that " No person shall be deprived of the right to worship God according to the dictates of his own conscience;" but it also declares, in section 10, that " No form of religion shall be estab-

lished by law, but it shall be the duty of the general assembly to pass suitable laws to protect every religious denomination in the peaceable enjoyment of its own mode of worship," &c. And the constitution of the United States declares that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." *Art. I., Amend. Constitution.*

Taking these provisions together, we are not authorized to infer from the prohibition against an established church, that the government is indifferent to religion in all its forms. It must be supposed that the founders of our government knew that the religious sentiment, besides involving the highest interest and duty of man, has always been a potent agency in giving strength to law and permanency to order. We assume that the separation of church and State was made because it was conceived that matters of faith are too elevated and spiritual for human control, and possibly for the additional reason that the diversity of creeds rendered hopeless the task of giving authoritative sanction to one without unjustly depressing others; all being equally sound and essential in the views of those entertaining them respectively. Instead of saying that the government has renounced all, it is more correct to say that the government recognizes all religious denominations. The constitution, which prohibits the establishment of any one, protects each and all "in the peaceable enjoyment of its own mode of worship." It is not denied that one of the most marked and distinctive features of our institutions is the perfect and unqualified freedom of opinion in matters of religion which they secure to all who dwell under them.

It seems to us that the leading purpose was to prohibit the establishment of any particular form of religion which would deprive persons not belonging to the favored church, of the right to worship according to the dictates of their own consciences, but to go no further, except to protect all. Can it be properly said to be against the spirit of the constitution, for a member of one of these religious denominations, so protected, to endeavor by peaceable and legal means to extend his faith and to influence his children and grandchildren to adhere to the church of their fathers—for one belonging to the Presbyterian or Methodist, or

any other denomination, to use such influences as argument, association, schools, colleges, donations, &c., to impress the minds of others, and particularly the youth of the country? Because such things may have some effect in determining religious opinions, can it be truly said that, therefore, they violate liberty of conscience, and are productive of evil consequences to the public—against public policy?

As we understand it, the good work of the ministers of the different denominations, under the highest commission, is directed to the promotion of morality, the increase of religion, and making converts to their own particular tenets, and upon this privilege rests the justification of all voluntary contributions to denominational schools and colleges, which the distinguished counsel for the plaintiff admitted were legal. He said: "If the testator had, in place of the plaintiff, given his money to establish a Roman Catholic school or college, his perfect right to do so could not have been disputed. In England a trust to establish a place of worship for Protestant dissenters was held good; and also a bequest for enabling persons professing the Jewish faith to observe its rights. 1 *Jarm. Will.* 190. * * * But the toleration, and I use the term in no invidious sense, of the right of one to dispose of his property is different from the use made of it when it becomes a means of coercion," &c.

It seems to us that in principle the distinction is rather shadowy between a donation for a school to be conducted according to certain religious forms, and one to a person to be educated in that school. It is admitted that such a condition as that under consideration would be held good in England, provided the church indicated was the Church of England (*Clavering* v. *Ellison,* 7 *H. of L. Cas.* 707); but it is said that it would be held good there only for the reason that that church is established by law, "because such a condition would be the public policy declared by the government, carried out in the disposition of the property." Apply this principle to our condition. We have no established church, and therefore, in the proper sense of the term, no "dissenters." Our constitution recognizes all denominations, and directs that the general

assembly shall pass laws for their protection. If recognition by law is the ground upon which courts are authorized to declare what is termed the public policy of the State, it would seem that what is allowed in England as to one, because recognized by law, might here be allowed as to all, equally recognized by the fundamental law.

We do not regard this case as analogous to that of *Egerton* v. *Earl Brownlow*, 4 *H. of L. Cas.* 149. In that case John William, Seventh Earl of Bridgewater, held under the crown a great dignity, in the nature of a public office, which was about to expire with him. He desired to have this dignity revived in his family, and for that express purpose devised his immense estates to Lord Brownlow, but if he should die "without having acquired the title of Duke or Marquis of Bridgewater, then the devise should be void." The condition of the devise was held to be void as against the public policy of England, in regard to the acquisition of dignities at the disposal of the crown. The terms of the condition made it an important matter of state. On the contrary, the matter here is purely one of private right, in regard to private property.

The power of disposition is general. The power to give includes the right to withhold or to fix the terms of gift, no matter how whimsical or capricious they may be, only provided they do not in any way violate the law. Mr. Magee, in his life-time, could have given money to educate his granddaughter at a particular school, or he could have withheld it at his pleasure. Suppose he had entered into a covenant with Elizabeth or her mother, that if she was educated at a particular school named, and under certain religious influences, he would, upon her attaining twenty-one years, pay to her five thousand dollars, we suppose that if she were not so educated, she could not go into the court and recover the money. Suppose, further, that before the time for payment arrived, John Magee had died, would that strengthen her claim to recover the money against his personal representatives? We are unable to see any material difference in regard to the necessity of complying with the terms imposed, between this supposed case and that of a voluntary gift by will.

We can not say that the terms of this will so far exceed the license which is allowed the citizen in the disposition of his own property, as to render it void as against public policy. We do not understand that there was anything in this bequest which can be properly called coercion, or that Elizabeth was "deprived" of the liberty of conscience. Terms were attached to the bequest which may seem to us exacting, unkind and unnecessary, but we cannot say they were unlawful or that they were complied with. If they were declined from conscientious motives, far be it from us to say that such conduct was wrong; but, from our view of the law, we are constrained to hold that the legacy, with its accumulations of interest, must go to those to whom, in the event which has happened, it was given by the will.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and the case remanded for such further orders as may be necessary.