307 P.2d 175

Clarence J. BARWIN and Frances M.
Barwin, Plaintiffs in Error,

v.

Robert W. REIDY, District Judge, Second
Judicial District of New Mexico,
Defendant in Error.

No. 6086.

Supreme Court of New Mexico.

Feb. 5, 1957.

Merritt W. Oldaker, Roy F. Miller, Jr., William H. Oldaker, Albuquerque, for plaintiffs in error.

McAtee, Toulouse & Marchiondo, Albuquerque, for defendant in error.

LUJAN, Chief Justice.

In the proceedings below three infant girls were ordered restored to the custody of their natural parents, Alfred Lee Webster and Christine A. Webster, his wife, in opposition to a petition for adoption of the infants by persons in whose custody the infants had been placed, Clarence J. Barwin and Frances M. Barwin, his wife. The order was superseded by filing of bond in accordance with the order granting writ of error upon petition by the Barwins, the would-be adoptive parents.

The Websters, in December, 1954, were living in Albuquerque, New Mexico, in a rented dwelling with their three children, one of whom, Sandra Annette, was then two months old. The parents were financially destitute, unemployed and unable to provide necessaries for themselves and their children. Through the kind offices of a neighbor, Mrs. Ferrier, her minister and friends, food was provided for the family and the children were cared for either at the home of Mrs. Ferrier or others. Mrs. Webster, with the agreement of her husband, apparently, concluded that some disposition must be made of the children and remarked to Mrs. Ferrier a short time after they became acquainted that she would have to place the children in an orphanage rather than have them go hungry. It was then that Mrs. Ferrier learned the plight of the family and offered the aid she and her friends provided.

While conditions thus stood Mrs. Webster saw the following advertisement in an Albuquerque newspaper:

"Responsible couple wish to adopt baby. Expenses paid. Phone 5-6406."

She called this number, which was that of Mrs. Jeanette Davis, who had interested herself in procuring children for adoption by way, she testified, of performing humanitarian service. In this instance, she was acting on behalf of Mr. and Mrs. Barwin who had previously communicated to her their desire to obtain a child for adoption. Mrs. Davis and her husband did not receive any money from the Barwins for acting on their behalf, nor did they receive anything from the Websters.

Mrs. Davis indicated her interest in the Websters' child, the two-month old baby, Sandra Annette, without disclosing who desired to adopt a child. Negotiations then commenced, largely between Mrs. Webster and Mrs. Davis, although Mr. Webster and Mr. Davis were present some of the time. Within a few days' time the Websters went to the office of an attorney in Albuquerque who was representing the Bar-

wins where they executed their consent for the adoption of Sandra Annette on forms issued for the purpose by the state welfare department. The Barwins were not present and the spaces on the consent forms for insertion of the name or names of the proposed adoptive parents were left blank at the time of execution. The names and identity of the proposed adoptive parents were not made known to the Websters. The Websters received $400 in cash at the office of this attorney, and signed a receipt identifying the payment for hospital and medical expenses in connection with the birth and care of the child, Sandra Annette.

Shortly after these occurrences, the Websters were taken into custody by members of the Albuquerque police force for questioning as to the manner in which they had released their baby for adoption. They were released with no charges being filed and then decided it would be best to release their remaining children for adoption also, the children being Lee Ann, aged three years, and Sharon Marie, about one and one-half years old. Mrs. Webster again contacted Mrs. Davis who said she was also interested in these children. Finally, the Websters went to the office of another Albuquerque attorney who represented the Barwins where they executed consents to the adoption of these children. These consents did not contain the names of the Barwins and the Websters remained without knowledge of their identity. There-after, the Websters were directed to go to an address in Albuquerque where they received $400 in cash from the Barwins through an anonymous person, a friend of the Barwins, who had been directed to give the money to Mrs. Webster rather than Mr. Webster, Mrs. Webster having previously represented to the Barwins, through Mrs. Davis, that the $400 payment made to her husband when Sandra Annette was released for adoption had not been used by him to pay the medical and hospital expenses incurred at her birth.

In each instance, a short time after the children were turned over to Mrs. Davis she delivered them into the custody of the Barwins. The Websters' hospital and medical expenses in connection with their children still remain unpaid.

After moving about in temporary employment the Websters finally established themselves in Gallup, New Mexico, where the husband, with assistance from his stepfather, was able to lease a filling station which he and his wife operate, residing on the premises. The Websters, mainly through Mrs. Webster, then began their attempt to regain custody of the children and eventually secured the services of an attorney to resist the petitions for adoption filed by the Barwins as to each of the children.

At the time of trial, which commenced November 21, 1955, the children had been,

for almost a year, in the exclusive custody of the Barwins, who are persons of high intelligence, good moral character and have the highest qualifications for parenthood.

The New Mexico Department of Public Welfare filed a report in court six or seven weeks before the hearing recommending the petitions of the Barwins be granted. Counsel for the Websters stipulated in open court that no claim was made the Barwins were not fit and proper people and absent the issues in the case that the Barwins would qualify as such under the rules and regulations of the New Mexico Department of Public Welfare.

The foregoing recitation is limited to undisputed facts. Upon generally conflicting evidence the trial court found as follows:

That at the time of the delivery of the children to Mrs. Davis the Websters knew and believed their children would not be adopted by Mrs. Davis and her husband; that the Websters were willing that their children be adopted by the persons on whose behalf Mrs. Davis was acting; that Mrs. Davis was at all material times the agent of the Barwins; that the natural parents were persuaded in releasing their children by reason of their impoverished circumstances and in consideration of the payment of the sums of $400 on two occasions; that the second payment of $400 was made by the Barwins for the purchase of the two older children, without the knowledge of their attorney and contrary to his instructions; that the Barwins knew this second payment was not to be used for the payment of any necessary medical or hospital expense; that the proposed adoptive parents knew it was wrong to make this payment.

The court further found the natural parents did not abandon their children; that the children were not dependent and neglected at or during the time the consents to adoption were executed; that the natural parents were able, at the time of the hearing, to properly financially support and care for their children and provide a suitable home and environment for them; that the Barwins, because of their superior financial position, were able to overreach and influence the natural parents unjustly in giving their consents to the adoption of their children.

Other facts will be referred to hereafter in connection with the issues raised.

Certain of the court's findings are attacked here, as are these conclusions of law made by the court.

"1. Section 22-2-5, New Mexico Statutes, 1953 annotated, requires that consent to the proposed adoption be obtained, and which was not accomplished in this case.

\* \* \* \* \* \*

"3. That a consent in blank, omitting the identity of the adoptive parents and where the identity of the

adoptive parents is concealed, is an insufficient consent upon the ground that such consent is against public policy and is not a consent with reference to the specific 'proposed adoption.'

\*　　\*　　\*　　\*　　\*　　\*

"8. That the execution of the consent itself and the surrounding circumstances in which the Websters found themselves did not constitute the abandonment of their children by which this Court could take jurisdiction of the cause and remove the children from their natural parents without their consent.

"9. That the purchase and sale of children for adoption is against public policy, and that any consent to an adoption given for monetary consideration is void and of no effect.

"10. That the Barwins are in physical custody of the three minor children without legal right, and that the children should be forthwith restored to their natural parents.

\*　　\*　　\*　　\*　　\*　　\*

"12. That the Websters are fit and proper persons to have the custody of their children.

"13. That consents given by natural parents to the adoption of their children by another, given under duress and financial strain, are ineffective and do not in law constitute a valid consent to adoption.

"14. That the consents, being void and ineffective, the court not having found the children to be dependent, neglected or abandoned, loses jurisdiction and the natural parents are entitled to the custody of their own children.

\*　　\*　　\*　　\*　　\*　　\*

"16. That the best interest and welfare of the children will be subserved by their being returned to the custody of their natural parents."

The plaintiffs-in-error, the proposed adoptive parents, have made nine points in their attack upon the proceedings. Many of these points are overlapping, and some do not merit consideration. The issues raised will be considered under the following questions:

1. Is a consent to adoption valid where the names of the proposed adoptive parents do not appear upon the consent of the natural parents to adoption from whom the identity of the would-be adoptive parents has been concealed?

2. Do the circumstances under which the consents were given render them inoperative?

3. Under what circumstances may revocation of a valid consent be allowed?

4. Were the children abandoned by their natural parents?

5. Was it reversible error for the trial court to refuse to hear evidence tendered by the proposed adoptive parents pertaining to the welfare of the children and treating of the fitness and ability of the proposed adoptive parents to care for the children as well as the manner in which the children had been treated by them, when it was stipulated they were fit and proper people, fully qualified under welfare department rules and regulations and no issue was raised thereon?

It is not contended the courts of this state have jurisdiction to decree the adoption of children absent either a valid consent to the adoption by the person or persons specified by statute, or the existence of circumstances which render consent unnecessary as, for example, where children have been abandoned or are dependent and neglected. §§ 22–2–5, 22–2–6, N.M.S.A. 1953.

Section 22–2–5, 1953 Comp., provides:

"Subject to the provisions of section 6 of this act (22–2–6), written consent to the proposed adoption, duly acknowledged before a notary public, must be filed in the proceedings before any decree of adoption may be granted. Such consent must be obtained from the following:

"(a) The child, if over the age of twelve (12) years;

"(b) The parents of the child born in wedlock, if living;

"(c) The mother of the child born out of wedlock, if living;

"(d) The person or organization having lawful custody of the person of the child, if other than the parent or parents."

■ In Heirich v. Howe, 50 N.M. 90, 171 P.2d 312, we pointed out that the power to adopt children was unknown to the common law; that it is a creation of statute which may prescribe the conditions under which adoption may be legally effected. The jurisdictional requirements of the statute for this special proceeding must be strictly followed.

■ This is unquestionably the law, and if the above section explicitly required the parents or other appropriate person must consent that the *named* adoptive parents might adopt their child or children, the present inquiry would thereby be concluded. What the statute requires, however, is a "written consent to the proposed adoption * * * filed in the proceedings." This language is subject to construction, and in so doing we are mindful that the purpose of statutes for adoption is to make provision for the welfare of children and the legislation should be liberally construed to effect that purpose. Crosby v. Harral, 35 N.M. 575, 4 P.2d 655.

The reason underlying the enactment of the requirement of consent to adoption is not obscure. The judicial severance of the relation of parent and child and the declaration of adoptive status should not be accomplished except under the most adequate safeguards against abuse. While parents have no property right in their children, In re Hogue, 41 N.M. 438, 70 P.2d 764, as long as they properly discharge their responsibilities they are entitled to the custody and the natural affection and allegiance of their children, who should not be taken from them and given to others by adoption unless the parents have manifested their wish and agreement to so do. A written consent to the proposed adoption, duly acknowledged before a notary public, is made the overt act by which the agreement of the parent to such proceeding shall be manifested. So far as we know, courts everywhere are powerless to alter the natural parent-child relationship and create an artificial one in its stead without this agreement, unless circumstances exist under which consent is unnecessary or may be waived.

Still more light is thrown on the purpose and effect of this provision when we consider that although the natural parents may specify the persons they wish to adopt their child, the court is not bound to so decree. "The selection of a foster parent is a *judicial* act and the responsibility is that of the chancellor." Hill v. Patton, 43 N.M. 21, 85 P.2d 75, 78. The court must determine what is in the best interest of the child and most productive of its welfare, the child being its ward under the doctrine *parens patriae*. In Hill v. Patton it is said that under a parental consent for the adoption of a child by couple number one the court may not, absent abandonment, etc., decree the adoption of the child by couple number two. This ruling is thought to bolster the argument of the natural parents here that consent to adoption is void unless it be in favor of specific named persons known to them. We do not think this conclusion follows. The rationale of the rule seems more properly to be that the consent given has been limited to adoption only in favor of the persons named.

Since adoption may be refused to petitioners who have the strongest endorsement of the parents, we think it follows that the office of the requirement of consent for adoption is to indicate the willingness of the parents that the natural relationship be *swept away and a new one created in its stead.* The giving of consent is indicative of the subjective state of mind of the parents—expressive only of the individuals and binding no one unless the court shall choose to act thereon. It is up to the court to perform the objective acts of severing the natural relationship and creating an artificial status by judicial determination. As it may or may not decree adoption in favor of persons recommended by the natural par-

ents, it seems most unlikely the legislature intended to impose as a condition to the exercise of the court's jurisdiction knowledge of the identity of petitioners in adoption on the part of the natural parents, because even when that circumstance exists, and possibly the further circumstance that the natural parents have investigated the qualifications of the petitioners and given them their unqualified approval, the court may still refuse to decree adoption, the selection of a foster parent being a judicial act and the responsibility being that of the court.

The court below found when the consents were executed the natural parents contemplated and agreed their children would be adopted by persons unknown to them on whose behalf Mrs. Davis was acting. Their expressions of agreement have been filed in the proceedings by the contemplated persons. There is no suggestion the non-disclosure was fraudulent.

■ We are of opinion the statutory requirements have been met and the lower court was vested with jurisdiction unless the execution of the consents in such manner violated the public policy of this state, as declared by the lower court.

The natural parents seem to have abandoned any reliance they may have placed upon this ruling for no argument is set forth supporting it in their brief and they comment that whether blanket consents should or should not be allowed is a question for the legislature. We have considered the matter, however, for if public policy has been violated it should be so declared and the ruling of the trial judge should be affirmed.

■ We approve this language from Weeks v. New York Life Ins. Co., 128 S.C. 223, 228, 122 S.E. 586, 587, 35 A.L.R. 1482, as to what public policy is and where it is to be found:

"Public policy has been aptly described by one of our judges as 'a wide domain of shifting sands.' * * * The term in itself imports something that is uncertain and fluctuating, varying, with the changing economic needs, social customs, and moral aspirations of a people. * * * For that reason it has frequently been said that the expressive public policy is not susceptible of exact definition. But for purposes of juridical application it may be regarded as well settled that a state has no public policy, properly cognizable by the courts, which is not derived, or derivable by clear implication from the established law of the state, as found in its Constitution, statutes, and judicial decisions. * * * Hence, since * * * 'it is the duty of the Legislature to make laws and of the court to expound them, * * * the subjects in which the court undertakes to make the law by mere declaration (of public

policy) should not be increased in number without the clearest reasons and the most pressing necessity.' " Quoting from Magee v. O'Neill, 19 S.C. 170, 185, 45 Am.Rep. 765.

A rule that blank or blanket consents for adoption are void may be a sound rule for society to follow, but we should not declare it as an established rule of public policy unless we can say without any hesitancy it is contained in or clearly derivable from our Constitution, statutes and judicial decisions.

 ██ Moreover, our caution is the more to be exercised because it is a matter of common knowledge that numerous decrees of adoption have been rendered where the person whose consent was required remained unaware of the identity of the adoptive parents either by choice or in compliance with the wishes of petitioners for adoption, viewing that course to be in the best interests of the future well-being of the child. The trial court refused a finding to this effect, but such refusal was erroneous. To declare void consents to adoption so executed would render many children in this state insecure in their relationship with their adoptive parents, as the proceedings could be attacked even after a lapse of many years. Not to be overlooked, too, is the uncertainty which would be cast upon the law of estates.

We have already seen there is no compelling declaration on the subject in the statute covering required consents, nor any by logical construction. The only other statute bearing on the issue directly is § 22-2-6, which names the instances in which required consent, except that of the child over twelve years of age, may be dispensed with in the discretion of the court, following notice and hearing. These instances are:

"(a) In the case of a parent when he or she has been lawfully deprived of the custody of the child through divorce or legal separation;

"(b) When he or she has been deprived of custody of the child by a court of competent jurisdiction in proceedings under or like in substance to those prescribed by * * * the law of this state relating to dependent and neglected children;

"(c) When consent of the guardian of the person of the child, under appointment of a court of competent jurisdiction, is filed;

"(d) After diligent search and inquiry, the names of the parent or parents or legal guardian, or their whereabouts, are unknown and cannot be ascertained; or where the parent or parents or guardian have wilfully failed to maintain and support the child, when obligated and financially able to do so, or have been guilty of such cruelty, depravity, abuse, or gross neglect toward the child that, in the opinion of the

court, the child should be removed from the custody of such parent or guardian."

The notable thing about this section, for present purposes, is that the person whose consent is otherwise required may forfeit his right to withhold or grant consent upon the basis of the voluntary conduct toward the child. Since the entire right may be so lost, we see no reason why a portion of the right—the specification of the persons in whose favor consent to adoption is given, may not be the subject of voluntary waiver.

The decision of this Court in Ex parte Wallace, 26 N.M. 181, 190 P. 1020, contains language expressive of the desirability of a cloak of anonymity to shield the adoptive parents from unjust demands which might be made by the putative father of an illegitimate child, whose consent was not required to be entered in the adoption proceedings, and who could not demand notice thereof.

We are aware of no other statutes or decisions of this Court which may be the basis for the declaration of public policy in this consideration and we are unable to conclude that public policy was violated in the execution of the consents before us.

We are told that the weight of authority is that blanket consents are void, either by statute, or as violative of public policy, and are referred to an annotation covering the subject in 24 A.L.R.2d at page 1129, where we find analysis of cases from Pennsylvania and North Carolina. In addition, counsel for the natural parents cite to the same effect Sears v. Davis, Tex.Civ.App., 19 S.W. 2d 159.

After examining the cases, we do not think the weight of authority, if such it is, is so formidable as to preclude an independent determination and conclusion to the contrary by this court. Of interest in this connection are the cases: Rhodes v. Shirley, 234 Ind. 587, 129 N.E.2d 60; Lee v. Thomas, 297 Ky. 858, 181 S.W.2d 457; and Adoption of Capparelli, 180 Or. 41, 175 P.2d 153.

Still to be considered is the question whether other factors involved in the transaction render the consents to adoption inoperative.

It is first to be noted the trial court specifically found the two older children, Lee Ann and Sharon Marie, last released for adoption, were the subject of purchase and sale. No specific finding was made to that effect about Sandra Annette, the first of the children released. It was found as to all of the children that the Websters were persuaded in releasing them because of impoverished and necessitous circumstances and in consideration of the payment of the sums of $400 on each occasion; that the Barwins, through their agent, Jeanette Davis, and because of their superior financial position, were able to overreach and influence the Websters unjustly in giving their consents to the adoptions; that at the

time the consents were executed the Websters were in dire financial difficulties. It was concluded as a matter of law that the purchase and sale of children for adoption is against public policy and that any consent to an adoption given for monetary consideration is void and of no effect; and, further, that consents to adoption given under duress and financial strain are ineffective and invalid.

The testimony respecting the monetary arrangements between the parties has been read and re-read in its entirety. The conclusion is inescapable that the findings respecting the manner in which the two older children were released for adoption are supported by substantial evidence, and, in large measure, upon almost identical testimony coming from all involved.

On January 15, 1955, Mrs. Webster contacted Mrs. Davis concerning the adoption of Lee Ann and Sharon Marie, at which time she was informed and advised that Mrs. Davis was greatly interested in adopting the children and would make the same monetary arrangements as before. Lee Ann and Sharon Marie were delivered to the Davis home on or about February 4, 1955. Immediately prior thereto the Websters attempted to obtain $800 from Mrs. Davis or the parties for whom she was acting, as a condition precedent to the delivery of the children and execution of consents to adoption for them. The Barwins would not pay

this sum and a little while later Mrs. Webster called Mrs. Davis stating the payment of $400 would be acceptable and requesting the money be paid directly to her as her husband had not used any of the first $400 to pay hospital and medical expenses on account of Sandra Annette's birth and Mrs. Webster wanted to be sure the next money would be used for that, and for medical expenses for Lee Ann who had apparently had some blood transfusions at an earlier time.

Consents for the adoption of these two children were signed in the office of a second attorney engaged to represent the Barwins. About February 2, 1955, Mrs. Webster was given $400 cash through a friend of the Barwins, which payment was made by the Barwins for the purchase of the children. It was made without the knowledge of their attorney and expressly contrary to his instructions to them. The Barwins knew this money was not going to be used to pay hospital or medical expenses and they knew their act in making this second $400 payment was wrongful.

We are certain not one of these people faced the facts and recognized their actions effected the purchase and sale of two little children. The natural parents were motivated by their desire to make suitable disposition of their children and, doubtless, assuaged their consciences in selling them with the balm the money they received was

only for hospital and medical expense in connection with the children. The adoptive parents must have soothed their ethical sensitivities with the same potion, they being primarily motivated by desire to adopt the children and keep all three of them together.

While we are cognizant of the tragedies which gave rise to the situation in which the parties found themselves, our concern is, and must be, solely for the welfare of the children, unswayed by considerations of sympathy for others or sentimentality. The procedure followed with respect to the children, Lee Ann and Sharon Marie, cannot go uncountenanced—it vitiates the consents executed for their adoption.

But denouncing the acts of the adults does not settle the question of what happens to the children. Can it be said that natural parents may sell their children, enjoy the proceeds, and then come into court and demand the return of their children? If so, what would there be in law to prevent their selling the children over and over again? The answer is clear—the act of selling children constitutes abandonment of them as a matter of law. In fact, we can think of no more drastic way in which children could be abandoned, unless it be simply to leave them alone and exposed to the elements. The trial court refused to find any of the children had been abandoned. This was error.

It follows that the lower court had jurisdiction of the petitions relating to Lee Ann and Sharon Marie upon the basis they were abandoned children. It was within the jurisdiction of the court (a) to return these children to the custody of their natural parents; or, (b) to grant the petitions of the Barwins for the adoption of the children; or, (c) to refuse either of the foregoing, and make other temporary or permanent disposition and provision for these children: All to be determined upon one single consideration—the welfare of the children.

It is commonly the case that persons wishing to adopt a child will make provision with its mother, or mother and father, before birth of the child, to pay hospital and medical expenses in connection with the care of the mother and child. There is nothing in this practice inimical to public policy. Indeed, it is productive of the welfare of the child that the child and the mother have adequate medical attention which perhaps would not otherwise be provided. If it is permissible to agree to discharge prospective expenses, where is there harm in agreeing that debts already incurred for the same reason and as yet unpaid shall be paid by would-be adoptive parents? Of course the best practice would be for payment to be made directly from them to the creditors—that is, the hospital and doctor. But if payment is made to the

natural parents for such purpose under the reasonable belief the money will be used by them to discharge such indebtedness, there is no wrong in law. That is all that happened concerning Sandra Annette, as far as the Barwins knew. There is a stipulation in the record between counsel for the Websters and the first attorney who represented the Barwins that the Websters represented to him that Sandra Annette was born by Caesarean section, although it was not true.

The Websters were advised by that attorney of the consequences attendant upon their execution of consents of this adoption. Other persons, too, talked with them about it. They knew what they were doing—they made their own decisions. It was they who represented a Caesarean section had been performed; it was they who failed to employ the money for the purpose for which they received it. To allow them to come in and vitiate the proceeding as to this child's adoption upon the ground they did not live up to their agreement and obligation would be a legal absurdity.

After Sandra Annette had been turned over to Mrs. Davis, the Websters called her about their older children. During the course of their dealings with her, money was again brought up for discussion. Mrs. Davis said the same arrangements would be made as before. Then the Websters, this time through Mr. Webster, called Mrs. Davis and asked for $800 as a condition precedent to releasing the older children, although they had used the $400 earlier paid them for purposes other than the payment of hospital and medical expenses. The payment of this sum was refused. Then, a short while later Mrs. Webster called Mrs. Davis and either asserted or agreed the Websters would release the children for $400.

If there is unjust overreaching here, it is the Websters and not the Barwins who have accomplished it. Mrs. Barwin admitted she knew it was wrong to make the second payment, against the instruction of her attorney and in concealment from him. Her ethical inclination in this instance was overborne by the demands of the child's parents, who tried to and did benefit themselves at the expense of the Barwins.

 Sandra Annette was not released for monetary consideration and the Barwins did not unjustly influence or overreach the Websters by superior financial position. Findings to the contrary are not supported by the evidence.

 We do agree there was a form of duress present when the consents were executed, but it is not duress of a type which renders void contracts or other actions. Legal duress is defined in McDonald v. Carlton, 1 N.M. 172, 176:

"* * * Duress in law books is defined to be an actual or threatened vio-

lence or restraint of a man's person, contrary to law, to compel him to enter into a contract or discharge one: See 1 Bouv.Law Dict. 493. By duress in its more extended sense is meant that degree of severity, either threatened or impending or actually inflicted, which is sufficient to overcome the mind of a person of ordinary firmness: See 2 Greenl. on Ev. 302. * * *"

It is further said:

"That species of compulsion which does not appear in overt acts of violence or threats, but in overpersuasion and advantage taken by parties in peculiar relations of trust or influence over the weak and ignorant, comes within the purview of constructive fraud: See Story on Con. 321."

We are not dealing with either species of compulsion here, but simply duress of circumstances, circumstances in no way the creation of the Barwins.

If consents to adoption were ineffective every time this sort of duress entered the picture, it is difficult to see how any adoption where consent is required could be allowed to stand, for what natural parent would ever consent to the adoption of his or her child in the absence of duress of circumstance?

█ The better authority is that prior to the entry of an adoption decree, the court may grant or refuse revocation of consent, giving due consideration to the circumstances in the particular case, as, for example, the matters giving rise to execution of consent in the first place, a showing or failure to show change of those matters; the situation of the proposed adoptive parents; the length of time which has elapsed since consent has been given; the extent to which the adoptive petitions have relied and acted upon the consent; and all those matters pertaining to the past, present and future welfare of the child. In re Holman's Adoption, 80 Ariz. 201, 295 P.2d 372; Rhodes v. Shirley, 234 Ind. 587, 129 N.E.2d 60; Skaggs v. Gannon, 293 Ky. 795, 170 S.W.2d 12; Adoption of McKinzie, Mo.App., 275 S.W.2d 365, and Wyness v. Crowley, 292 Mass. 461, 198 N.E. 758.

█ Perhaps it needs to be made clear in this case, as said in Rhodes v. Shirley [234 Ind. 587, 129 N.E.2d 63]:

"When a child comes before the court for adoption, whether on the basis of the desertion or consent of the natural parents filed with the court, the present disposition, the status and the fact of the blood relationship of the natural parents are material factors for consideration by the court. They are material in determining what is for *the present best interests of the child.*

They are not considerations which void all others."

■ All our statutes require is that consent be *filed* in the proceedings. That consent may not be arbitrarily revoked prior to adoption, at least where the petitioners for adoption have acted upon the consent and taken the child into their home, is the only interpretation we can place upon our procedure for adoption which is consonant with the paramount canon of making that construction which is in the best interest of the child's welfare. See In re Adoption of a Minor, 79 U.S.App.D.C. 191, 144 F.2d 644, 156 A.L.R. 1001.

The matter of the fitness of the proposed adoptive parents to become such having been agreed to by the parties below and the trial court having considered their stipulation as disposing of that issue, and there being naught in the record to dispute it, we find no occasion to question the verity of the parties' agreement on the issue.

The judgment will, therefore, be reversed and the cause remanded with a direction to the trial court to proceed with the adoption with the admonition, nevertheless, that an award of custody of the minor children to their natural parents on the record as it stands would amount to an abuse of discretion, as we view the matter.

It is so ordered.

SADLER, McGHEE, COMPTON and KIKER, JJ., concur.