351 S.E.2d 72

**Lorraine WOOTEN, Appellant,**

v.

**Albert WALLACE and Lorraine Wallace, Appellees.**

**No. 17305.**

Supreme Court of Appeals of West Virginia.

Nov. 26, 1986.

Rehearing Denied Feb. 17, 1987.

Daniel F. Hedges, Charleston, for appellant.

Richard W.W. Sydnor, Jr., Huntington, for appellees.

NEELY, Justice:

In 1981 Lorraine Wooten was a young, twice-divorced, desperately unhappy mother of a 3½–year-old daughter, Sabrina Mack. Mrs. Wooten had been divorced from Samuel Mack in 1980 and granted legal custody of Sabrina under the supervision of the Child Welfare Department of Loraine County, Ohio. Within thirty days of her divorce from Mr. Mack, Mrs. Wooten married Mr. Randy Ross. Marital problems with Mr. Ross developed within three months of the marriage and Mrs. Wooten and Mr. Ross were divorced in September, 1980. Mrs. Wooten lost a second child, the progeny of her marriage to Mr. Ross, during the sixth month of her pregnancy in 1980. During all this turmoil she received constant threats from her ex-husband, Samuel Mack, that he would take Sabrina from her custody.

In March or April, 1981, Mrs. Wooten and Sabrina left Ohio to move in with Mrs. Wooten's father, Albert Wallace, and her stepmother, Lorraine Wallace. Although the record is confused concerning the spe-

cifics of the matter, it is clear that one reason for Mrs. Wooten's move to West Virginia was fear that her custody of Sabrina would be interfered with by the Loraine County child welfare authorities.

The record supports the appellees assertion that shortly after arriving in Logan County, Mrs. Wooten suggested to Mr. and Mrs. Wallace that they adopt Sabrina because Mrs. Wooten, in the words of a letter to Mrs. Wallace, did not love her, could not raise her and did not want her. Tensions developed within the Wallace household over what appeared to Mr. Wallace to be a lack of ambition on Mrs. Wooten's part. His specific complaint was that Mrs. Wooten lounged about the house during the day and stayed out late at night. During the period of Mrs. Wooten's stay with the Wallaces it is undisputed that there were calls from the Ohio Child Welfare Department concerning Mrs. Wooten and Sabrina, but no clear conclusions concerning the nature of these calls can be determined from the record.

Nonetheless, on 5 May 1981 Mrs. Wooten wrote a letter to her stepmother in which she indicated that she was planning to leave without Sabrina and in which she asked her stepmother to take care of the child because she could not do so. She specifically indicated in that letter that Mrs. Wallace would be the kind of mother that Sabrina deserved.

Also on 5 May 1981 (after Mrs. Wallace informed Mrs. Wooten about a telephone conversation with an officer from the Cleveland Ohio Child Welfare Department concerning Sabrina) Mrs. Wallace asked Mrs. Wooten whether she still wanted to sign adoption papers for Sabrina. Mrs. Wooten responded affirmatively. Mrs. Wallace had contacted a local attorney, Mr. Bernard Spaulding, whom she had asked to prepare a consent for Sabrina's adoption. Although in the hearing below Mrs. Wallace admitted that Mrs. Wooten appeared to be upset at the time these discussions

transpired, the record indicates that Mrs. Wooten did indeed want her father and stepmother to adopt Sabrina.

Following the 5 May 1981 conversations, Mrs. Wooten and Mr. and Mrs. Wallace went to the office of attorney Spaulding where, as the record clearly and cogently demonstrates, Mr. Spaulding explained Mrs. Wooten's rights in great detail and carefully inquired whether she wished to relinquish her parental rights. When it appeared that Mrs. Wooten did not understand the exact nature of what she was undertaking to do, Mr. Spaulding explained succinctly that by signing adoption papers Mrs. Wooten would be relinquishing forever all parental interest in Sabrina. Mrs. Wooten then signed the consent to adopt and, thereafter, immediately left the house of her father and stepmother to live out-of-state.

However, on 23 September 1981 Mrs. Wooten signed a Revocation of Consent to Adoption and brought a Writ of Habeas Corpus to recover custody of Sabrina. Apparently that proceeding was not prosecuted with vigor, but on 8 August 1986 the Circuit Court of Logan County confirmed the findings and recommendations of a special commissioner and held that the adoption consent was valid and irrevocable. Mrs. Wooten now appeals on the grounds that her consent to adopt was procured through duress and was not voluntary. We disagree and affirm the circuit court.

Mrs. Wooten's habeas corpus petition was based upon *W. Va. Code*, 48–4–1a [1965], which allows an otherwise valid adoption to be set aside if it was the product of "fraud or duress."[1] However, the word "duress" as used in *Code* 48–4–1a [1965] implies something more than a natural parent's personal circumstances which, at the time the consent to adopt is executed, make it more reasonable to put a child up for adoption than for the parent to raise the child herself.

In the context of a consent to adopt, duress has been defined as:

**1.** *W. Va. Code*, 48–4–1a [1965] has since been superceded by *W. Va. Code*, 48–4–5 [1985]. *W. Va. Code*, 48–4–5 [1985], like *W. Va. Code*, 48–4–1a [1965], allows the revocation of a consent to adopt when that consent was obtained by fraud or duress. Because the consent to adopt was executed in 1981, when *W. Va. Code*, 48–4–1a [1965] was still in effect, *W. Va. Code*, 48–4–1a [1965] remains the governing statute in this case.

the condition which exists where one is induced by the unlawful act of another to make a contract or perform or forego an act under circumstances which will deprive him of the exercise of his free will. *In Re Simaner's Petition*, 16 Ill.App.2d 48, 147 N.E.2d 419, 421 (1957) *aff'd.*, 15 Ill.2d 568, 155 N.E.2d 555 (1959).[2] Although we do not believe that the act of a third party must be *unlawful* in order to constitute duress under *W.Va.Code*, 48–4–1a [1965], we do believe that the act of the third party must be so egregious as to be unconscionable.

■ There is no question that Mrs. Wooten was under some form of "duress" in a general sense; she was an untrained, divorced, emotionally upset young woman with little prospects for supporting herself, much less Sabrina, other than living in her father's house. Nonetheless, to the extent that these factors constitute a type of duress, they are not the type of manufactured duress contrived by the adopting parents that the statute contemplates. Were we not to interpret "duress" in *Code* 48–4–1a [1965] narrowly, almost all adoptions would be subject to challenge. It is difficult to conceive of circumstances in which a natural parent would place a child up for adoption unless the parent's personal circumstances were in some way incompatible with taking care of the child.

■ "Duress of circumstances" has generally been held insufficient to void an otherwise valid consent to adopt. In *Barwin v. Reidy*, 62 N.M. 183, 307 P.2d 175 (1957), the Supreme Court of New Mexico held that the fact that the natural parents of a child were penniless at the time they consented to the adoption of the child did not constitute duress. In so holding, the court stated:

> If consents to adoption were ineffective every time this sort of duress entered the

picture, it is difficult to see how any adoption where consent is required could be allowed to stand, for what natural parent would ever consent to the adoption of his or her child in the absence of duress of circumstances?

62 N.M. at 197, 307 P.2d at 185.

In *Regengold v. Baby Fold, Inc.*, 42 Ill. App.3d 39, 355 N.E.2d 361 (1976), the Appellate Court of Illinois held that the severe stress and "transient situational disturbance" felt by a 19–year–old natural mother due to her recent divorce, the anticipated divorce of her parents with whom she was living, medical difficulties, financial difficulties, the responsibility of a new position at her place of employment, and her fear that her mother intended to force her and her child out of the home, did not constitute duress under the Illinois revocation of adoption statute.

Likewise, the Supreme Judicial Court of Massachusetts, in upholding a consent to adopt against a claim of duress, stated:

> No statute has said that surrenders are valid only if executed free from emotion, tensions, and pressures caused by the situation. No principle of law requires the rule. A balance of the interests of society weighs strongly against it.

*In Re Surrender of Minor Children*, 344 Mass. 230, 181 N.E.2d 836, 839 (1962).[3]

Mrs. Wooten argues that Mrs. Wallace's representations concerning calls by the Ohio Child Welfare Department caused her acute distress. However, the record clearly reveals that there were calls from the Ohio Child Welfare Department and that Mrs. Wooten made no effort to determine the exact dimensions of her problems with the Ohio authorities by contacting them.

Although we sympathize with Mrs. Wooten's predicament, we agree with the cir-

---

**2.** This definition of duress is also employed in the adoption context in *People ex rel. Drury v. Catholic Home Bureau*, 34 Ill.2d 84, 213 N.E.2d 507 (1966); *In Re Petition of Wojtkoniak*, 14 Ill.App.2d 344, 144 N.E.2d 760 (1957); and *In Re Interest of Sims*, 30 Ill.App.3d 406, 332 N.E.2d 36 (1975).

**3.** To the same effect are *McCurdy v. Albertina Kerr Homes, Inc.*, 9 Or.App. 536, 498 P.2d 392

(1972); *Anonymous v. Anonymous*, 23 Ariz.App. 40, 530 P.2d 896 (1975); *In Re Simaner's Petition, supra*; and *Adoption of Doe*, 87 N.M. 253, 531 P.2d 1226 (1975). Nor does advising or attempting to persuade a natural parent to consent to adoption constitute duress. *See Anonymous v. Anonymous, supra; People ex rel. Drury v. Catholic Home Bureau, supra;* and *In Re Simaner's Petition, supra.*

cuit court that Mrs. Wallace relied upon Mrs. Wooten's consent to adopt and undertook in good faith to raise Sabrina. Adoption is highly favored in our law because it provides an opportunity for children who would not otherwise have stable family lives and financial support to acquire these benefits. Furthermore, if we were to give to the word "duress" found in *Code*, 48-4-1a [1965] the type of expansive definition that Mrs. Wooten urges, we would undermine the extent to which adopting parents could rely on consents to adopt. Natural parents could then challenge otherwise valid adoptions after the personal circumstances that compelled them to place the child up for adoption had passed. But no normal couple would undertake to adopt a child and risk establishing the supreme ties of affection and concern that exist between parents and child if they were in constant jeopardy of having their child ripped from their arms by a returning natural parent.

Accordingly, for the reasons set forth above the judgment of the Circuit Court of Logan County is affirmed.

Affirmed.