418 S.E.2d 575

**STATE of West Virginia ex rel. Naoma Lee SMITH, Petitioner,**

v.

**Honorable W. Robert ABBOT, Judge of the Circuit Court of Fayette County, and Christopher Duke King, Respondents.**

No. 20854.

Supreme Court of Appeals of West Virginia.

Submitted March 3, 1992.

Decided May 15, 1992.

James M. Cagle, Charleston, for petitioner.

Carl L. Harris, Blake & Harris, Fayetteville, for respondent Christopher Duke King.

BROTHERTON, Justice:

The petitioner, Naoma Lee Smith, invokes the jurisdiction of this Court in a petition for a writ of prohibition to prevent the Circuit Court of Fayette County from granting the respondent's motions for custody or increased visitation, and also asks that the petitioner be named the exclusive parent with legal custody of the child.

The respondent, Christopher Duke King, opposes Smith's petition and asks that the final adoption decree entered on March 30,

1983, be set aside and that he be awarded the care, custody, and control of the child, R.B. In the alternative, he argues that he be awarded increased visitation rights. Finally, he requests that the Court hold the petitioner, Naoma Smith, in contempt of court for "willful and contumacious violation of the terms of the final adoption decree" for failing to have the child known by the surname King and for allowing only limited visitation, and that Ms. Smith be required to pay the petitioner's attorneys fees and court costs.

The subject of this petition is a minor child known alternatively as R.B. King and R.B. Smith. He was born on April 14, 1982, in Raleigh County, the natural child of Deborah Lynn Ingram. The petitioner, Ms. Smith, however, took the child home from the hospital. On April 19, 1982, Deborah Ingram consented to the adoption of R.B. by Ms. Smith and consented to the change of his last name to Smith. At that time, she identified Christopher Duke King as the putative father of the child. Mr. King questioned the paternity of the child and submitted to blood tests, which eventually showed that he was, in all probability, the father of the child. On February 17, 1983, after the test results were obtained, Mr. King, acting by counsel, objected to the adoption and prayed for custody of R.B. However, Judge Abbot permitted the adoption of R.B. by Ms. Smith after severing the natural mother's parental rights. However, he failed to sever Mr. King's parental rights and provided Mr. King with visitation.[1] The court, on its own motion, ruled that the child's surname was King, not Smith as requested by the petitioner. Finally, the court ruled that Mr. King did not have to pay support, despite having visitation rights.

Since the adoption, R.B. has lived with the petitioner and her two daughters. He

1. That portion of the adoption order which maintained the parental rights of Mr. King reads as follows:

The court finds that the said Christopher Duke King is the natural father of the said infant and that his natural paternal rights are not to be severed by the entering of this adoption decree and that said Christopher Duke

King shall have the right of liberal and reasonable visitation to the infant child, upon proper notice. Said visitation to take place at the home of the petitioner or at any other location mutually agreed upon by the petitioner and the said Christopher Duke King.... Christopher Duke King shall not be required to pay child support.

is currently a student in the fourth grade at an elementary school in Fayette County, West Virginia. There has been no allegation that Ms. Smith has been anything but an excellent mother to R.B. Mr. King has resided in North Carolina since 1983. Since the adoption, the respondent King has visited the child approximately fifteen times in nine years and taken the child out to buy birthday and Christmas gifts. However, he has never provided any child support for R.B.

Although no date is given, the respondent King has married Deborah Ingram, the natural mother of R.B. They have two girls, who are the natural sisters of R.B. Thus, in 1991, King petitioned for modification of the adoption decree, asking that the March 30, 1983, adoption decree be set aside, or in the alternative that visitation be enforced according to the rules found in the Circuit Court of Fayette County. He also asked that Ms. Smith be held in contempt for allegedly violating the terms of the final adoption decree regarding visitation and the child's name. Mr. King stated that he was "now gainfully employed and living in a stable family relationship with the mother of the infant who is the subject of this action and their two daughters, the natural sisters of the infant, R.B. King."

Judge Abbot entered an order dated November 14, 1991, in which he stated that King was entitled to visitation during the weekend beginning November 15, 1991, which would not include overnight visitation. Beginning March 13, 1992, the petitioner was entitled to one overnight visitation. The petitioner was also permitted to have overnight visitation at his residence in the State of North Carolina beginning June 19, 1992. The petitioner was permitted to have R.B. for a one week period during the summer of 1992. The visitations were to continue monthly thereafter as the parties deem appropriate and major holidays shall be alternated. The court also ruled that

the respondent violated the prior order of the court in that the child is known as R.B. Smith instead of R.B. King. Finally, the order states that the child and the petitioner should have unlimited telephone contact. This petition for a writ of prohibition states the petitioner's objections to that order.

■■■ As in any situation involving the welfare of minor children, the paramount concern in this adoption case is what is in the best interests of the child. "[T]he welfare and best interest of the child should be the determinant of who should receive ... custody." *In re Custody of Cottrill,* 176 W.Va. 529, 346 S.E.2d 47, 50 (1986); *see also, Davis v. Hadox,* 145 W.Va. 233, 114 S.E.2d 468 (1960). Mr. King's desire to invalidate the adoption order did not take its present form until after his marriage to R.B.'s natural mother, who voluntarily severed all parental rights nine years ago. Invalidating the 1983 adoption decree and giving custody to the respondent would, in essence, allow the natural mother to avoid her surrender of parental rights[2] and threaten the relationship developed by the adoptive mother with R.B. over his first nine years of life.

Chapter 48, Article 4 of the West Virginia Code provides the parameters within which an adoption is considered valid. West Virginia Code § 48–4–1(b)(1) (1979) defines consent in an adoption case:

> (1) In the case of a child sought to be adopted, the written consent, duly acknowledged, of the mother and father (in the case of an illegitimate child, the mother and the determined father) or the surviving parent of such child sought to be adopted must be obtained and presented with the petition....

In this case, it is quite obvious that W.Va. Code § 48–4–1(b)(1) was not complied with by the court at the time of the adoption, since Mr. King, who objected to the adoption, never gave written consent and the adoption order specifically found that his

---

**2.** At least one other state has held such an attempt improper. In *Application of Ashmore,* 163 Ga.App. 194, 293 S.E.2d 457 (1982), the Georgia Court of Appeals denied the natural father's petition to legitimate the child where the father had not shown sufficient parental

interest, where the natural mother had surrendered her rights to the adoption agency, and because the father's motive in bringing the petition was to nullify the natural mother's surrender of parental rights following the marriage of the natural mother and father.

parental rights were not severed.[3] Therefore, the original adoption order was technically invalid. This finding, however, does not automatically place custody in the hands of the natural father.

West Virginia Code § 48–4–6 (1979) provides the method by which an adoption can be revoked. Subsection (a) provides:

(a) A parent or guardian of a legitimate child, or the mother or determined father or guardian of an illegitimate child who did not consent to the adoption of such child, any parent including the determined father of an illegitimate child entitled to notice as provided in subdivision (1), subsection (b), section one [§ 48–4–1] of this article who was not served with notice as provided in said subdivision (1), or any father of an illegitimate child entitled to notice as provided in subsection (b), section one [§ 49–3–1], article three of chapter forty-nine, who was not served with notice as provided in said subsection (b) may, at any time within one year after learning of or having reasonable opportunity to learn of the adoption, apply by petition to the court in which the adoption was granted, praying that the adoption be vacated. The court to which such application is made shall fix a date and time for a hearing, shall cause notice thereof to be given to the person or persons or agency who were permitted to adopt such minor, and, at the time so fixed, shall hear the petitioner and all parties interested, and may vacate or affirm the adoption in its dis-cretion. Any party interested may appeal to the supreme court of appeals from the decision of the court in the matter, as in other civil cases.[4]

Other states have recognized that failure to contest an adoption in a timely manner may preclude even a natural parent from bringing a subsequent action to vacate the adoption. In some jurisdictions, claims of irregularities in the adoption proceedings are barred unless an action to vacate an adoption is brought within the period specified by statute.[5]

■ Even where there is no similar statute, the equitable doctrine of laches may preclude delayed challenges to an adoption. In *Rodgers v. Rodgers*, 184 W.Va. 82, 89, 399 S.E.2d 664, 671 (1990), we quoted syllabus point 2 of *Bank of Marlinton v. McLaughlin*, 123 W.Va. 608, 17 S.E.2d 213 (1941):

Laches is a delay in the assertion of a known right which works to the disadvantage of another, or such delay as will warrant the presumption that the party has waived his right.

*See also, Kuhn v. Shreeve*, 141 W.Va. 170, 89 S.E.2d 685 (1955); *Pownall v. Cearfoss*, 129 W.Va. 487, 40 S.E.2d 886 (1946). It has been held that the defense of laches is sustainable only on proof of two elements: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense. *Mogavero v. McLucas*, 543 F.2d 1081 (4th Cir.1976). *See also, Maynard v. Board of*

---

3. This Court has no doubt that the 1983 adoption order was the result of an agreement between both parties' attorneys and the Court. While that agreement resulted in a settlement of the dispute at that time, it was in clear contravention of the statute and merely delayed the ultimate decision of custody until now, when the passage of time has infinitely complicated the issues. No agreements such as this must ever occur in place of compliance with the statutory requirements of W.Va.Code § 48–4–1 *et seq.*

4. The current version of this Code section, W.Va.Code § 48–4–12(a) (1984), contains substantially the same provisions.

5. *See, e.g., Walter v. August*, 186 Cal.App.2d 395, 8 Cal.Rptr. 778 (1 Dist.1960) (statute requiring claims for procedural irregularities to be brought within three years and for other irregularities within five years of the adoption decree); *Matter of Neagos*, 176 Mich.App. 406, 439 N.W.2d 357 (1989) (statute requiring action to be brought within four years of final decree); *Matter of Adoption of R.M.P.C.*, 512 So.2d 702 (Miss.1987) (statute prohibiting action from being brought more than six months after adoption decree); *Matter of Adoption of Lori Gay W.*, 589 P.2d 217 (Okla.1978), *cert. denied*, 441 U.S. 945, 99 S.Ct. 2165, 60 L.Ed.2d 1047 (1979) (statute prohibiting challenge to adoption more than one year after final decree); *Garcia v. DeEnriquez*, 313 S.W.2d 918 (Tex.Civ.App.1958) (statute requiring suits to be brought within four years of final decree). *See also, Petition for Revocation of a Judgment for Adoption of a Minor*, 393 Mass. 556, 471 N.E.2d 1348 (1984).

*Education of Wayne County,* 178 W.Va. 53, 357 S.E.2d 246 (1987); *Laurie v. Thomas,* 170 W.Va. 276, 294 S.E.2d 78 (1982); *Bank of Mill Creek v. Elk Horn Coal Corp.,* 133 W.Va. 639, 57 S.E.2d 736 (1950).

Other jurisdictions have applied the principles of laches to prevent a natural parent from contesting an adoption after a period of delay.[6] The overriding concern in all of these cases is the welfare of the child. In *In re Adoption of Frantz,* 21 Ariz.App. 36, 515 P.2d 333 (1973), the court quoted the following language from *In re Adoption of Hammer,* 15 Ariz.App. 196, 487 P.2d 417 (1971), as a reason for enforcing an adoption decree:

> "[T]here must be an end to the emotional stress and strain that is involved in the natural parents' attempt to regain custody of their child. The strain is particularly acute to the adoptive child itself, who may have established strong bonds of affection and love for the adoptive parents, and to the adoptive parents who must suffer the spectre of losing their child."

*Frantz,* 515 P.2d at 335. Moreover, in *In re Adoption of Miller,* 106 Ill.App.3d 1025, 62 Ill.Dec. 585, 591, 436 N.E.2d 611, 617 (1982), the court reiterated that:

> [A] parent's interest in his child "is not a passing fancy, not something that should occur to a parent almost as an afterthought or wait until the circumstances become absolutely ripe or most propitious." Rather it is "something that must be attended to immediately; not just for your own concern, but for the concerns of the child."

Consequently, in determining whether laches applies to bar a challenge to an adoption by a natural parent, courts have considered the length of time the child has resided with the adoptive parents, whether the natural parent has maintained contact with and/or supported the child, and whether the natural parent was aware of and acquiesced in the adoption.[7]

■ In this case, R.B. has lived with his adoptive mother for nine years, since he was four days old. The natural father visited the child once or twice a year for a short period of time. Although he occasionally took R.B. out to buy birthday and Christmas gifts, there is no evidence in the record that he made any attempt to provide support. Perhaps most persuasive to this Court is the fact that the natural father was completely aware of the adoption and, despite his initial objection, failed to make any attempt to obtain custody until recently, after he married the natural mother. It is obvious to this Court that the natural father's lack of diligence in asserting his objection to the adoption resulted in prejudice to the adoptive mother after nine years of believing R.B. was legally adopted. Consequently, we conclude that where the natural parent fails to exercise

---

**6.** *See In re Adoption of Frantz,* 21 Ariz.App. 36, 515 P.2d 333 (1973) (natural father's claim that consent to adoption was invalid barred by laches where claim was not raised until over two years after consent signed and over one year after final decree); *Ehrhart v. Brooks,* 231 Ga. 272, 201 S.E.2d 464 (1973) (natural mother's challenge to adoption barred by laches where challenge not raised until almost four years after learning of adoption); *In re Adoption of Miller,* 106 Ill.App.3d 1025, 62 Ill.Dec. 585, 436 N.E.2d 611 (Dist. 1, 1982) (natural father's action to vacate adoption, filed twenty-one months after learning of adoption, barred by laches); *Rodriguez v. Koschny,* 57 Ill.App.3d 355, 14 Ill. Dec. 916, 373 N.E.2d 47 (Dist. 1, 1978) (natural mother's petition to vacate adoption barred by laches where mother failed to make reasonable efforts to learn child's whereabouts for seven years following adoption and did not file petition until one year later).

**7.** When presented with a similar fact situation in *BB v. SS & JS,* 171 Colo. 534, 468 P.2d 859 (1970), the Colorado court refused to vacate an adoption decree in favor of the natural father. The child was given up for adoption upon consent of the natural mother. The natural father did not consent and initially contested the adoption. He failed to appear for the hearing, however, and his attorney notified the court that the father would not oppose the adoption. Less than five months later, the natural father changed his mind and filed a motion to vacate the adoption decree. The court concluded that the father's election not to contest the adoption amounted to implied consent and ruled that it would not be in the best interests of the child to vacate the decree.

his statutory right to contest an adoption performed without the consent of that natural parent under W.Va.Code § 48–4–6(a) (1979), the equitable doctrine of laches may apply to bar any attempt to invalidate that adoption order.

 Finality is of the utmost importance in an adoption. In *Wooten v. Wallace*, 177 W.Va. 159, 351 S.E.2d 72 (1986), this Court stated that "no normal couple would undertake to adopt a child and risk establishing the supreme ties of affection and concern that exist between parents and child if they were in constant jeopardy of having their child ripped from their arms by a returning natural parent." *Id.*, 177 W.Va. at 162, 351 S.E.2d at 75. Despite the flawed adoption order, it is much too late in R.B.'s life to correct the mistake. As an innocent victim of the court's failure to comply with the statute, he deserves the security a final ruling in this case will bring. The best interests of the child are, as always, our primary concern. Thus, we find that Mr. King acquiesced to the adoption in failing to exercise his rights under the statute.[8] Therefore, any attempt to overturn the 1983 adoption order must be denied. We hesitate, however, to completely terminate Mr. King's relationship with R.B. after nine years, because he has maintained some contact with the child. While the increased visitation granted in the November 14, 1991, order is improper, especially in light of the fact that the natural mother would also have visitation with the child, the visitation within Ms. Smith's home or a place mutually agreed upon between the parties is still permitted.

 Furthermore, it was error for the circuit court, *sua sponte*, to order that the child be named King when no such motion was made on the record. The only motion on the record was one requesting that the

child's name be changed to that of the adoptive family, Smith. Thus, for sake of continuity and simplicity, the child's name should be legally changed to Smith, as originally requested in 1983.

Accordingly, we grant Ms. Smith's petition for a Writ of Prohibition and rule that the November 14, 1991, order of the Circuit Court of Fayette County was improper, and this case is remanded to the Circuit Court of Fayette County for entry of an order consistent with this opinion.

Writ granted, case remanded for entry of an order consistent with this opinion.

---

8. Other states have examined cases involving flawed adoptions and come up with similar results. In *Petition of Negron*, 33 Ill.App.3d 112, 337 N.E.2d 375 (Dist. 1, 1975), the Illinois Appeals Court ruled that an unwed father who had contributed to the child's support in only three

of her eleven and one-half years and waited two years post-adoption to attack the adoption proceedings was not entitled to a vacation of the adoption decree despite the fact he had not been given notice of the adoption proceedings.