514 P.2d 1081

**Gerald HUEY and Bonnie Huey, Applicants-Appellees,**

v.

**Mary C. LENTE, Respondent-Appellant.**

**No. 1058.**

Court of Appeals of New Mexico.

June 20, 1973.

Certiorari Granted July 18, 1973.

Stevan Schoen, Albuquerque, for respondent-appellant.

Marc Prelo, Jr., Harold B. Albert, Ahern, Montgomery & Albert, Albuquerque, for applicants-appellees.

## OPINION

SUTIN, Judge.

This appeal involves termination of parental rights of a mother to her four year old son, pursuant to § 22–2–23, N.M.S.A. 1953 (Vol. 5, Supp.1971). "Termination of Parental Rights" is § 4 of the 1971 "Adoption Act."

The trial court terminated the mother's rights to her son, and she appeals.

We reverse.

(1) *Section 22–2–23, supra, Entitled "Termination of Parental Rights" is Invalid.*

At the opening of trial, a serious discussion between the trial court and counsel arose over the meaning and effect of the judgment provision of "Termination of Parental Rights." Section 22–2–23 provides for, (A) causes of termination; (B) who may initiate termination (hereinafter called "initiator"); (C) the contents of the application; (D) the time and place for hearing, and notice thereof with a copy of the application to be given to the parents of the minor, and then (E) the provisions for judgment. Subsection E reads as follows:

E. The court after hearing may grant or deny a judgment terminating parental rights. A judgment of the court terminating parental rights has *the same effect as an adoption judgment has in terminating the parent-child relationship, including terminating parental rights, dispensing with the consent,* and with any required notice of an adoption proceeding of a parent whose relationship is terminated by the judgment. [Emphasis added]

■ "The same effect" means the same result or the same consequences, Taylor v. Midland Valley R. Co., 197 F. 323 (D.Okl. (1912), as that provided for in § 22–2–33(A), supra, entitled "Effect of Judgment of Adoption . . ."

Subsection (A) provides in part:

A judgment of adoption . . . has the following effect as to matters within the jurisdiction or before the court:

(1) to relieve the natural parents of all parental rights and responsibilities; and

(2) *to create the relationship of parent and child between the petitioner and the individual to be adopted,* as if the individual adopted were a legitimate blood descendant of the petitioner for all purposes . . . . [Emphasis added]

"Termination of Parental Rights," therefore, not only relieves "the natural parents of all parental rights and responsibilities," but it also creates "the relationship of parent and child between the [initiator] and the individual to be adopted, . . . *dispensing with the consent,* and with any required notice of an adoption proceeding . . . ." [Emphasis added]

The trial court believed termination meant "the child has no parents." The mother's attorney believed "this child is in limbo." Huey's attorney believed "that once the court spoke then we could forthwith bring our adoption petition."

We are confronted with the usual statutory problems which arise under tangled, mixed-up language. Although no similar legislation has been cited to assist in statutory construction, we have found none with language similar to that set forth under § 22–2–23(E), supra.

"Termination of Parental Rights" statutes are an innovation in New Mexico. A model termination act was drafted by the Children's Bureau, United States Department of Health, Education and Welfare. See, Katz, Judicial and Statutory Trends in the Law of Adoption, 51 Georgetown L.J. 64 (1962). For other states which have set up statutory procedures to terminate parental rights to a child, see, Ritz, Termination of Parental Rights to Free Child for Adoption, 32 N.Y.U.L.J. 579, 590 (1957).

In 1970, Arizona adopted statutory authority for "Termination of Parent-Child Relationship." Section 8–531 to 8–537, Arizona Revised Statutes, Supplement 1972. It appears to follow the Model Termination Act. This statute creates a bifurcated proceeding for termination and adoption. Upon termination the juvenile court must: "1. Appoint an individual as guardian of the child's person;" or "2. Appoint an individual as guardian of the child's person and vest legal custody in another individual or in an authorized agency."

The purpose of this bifurcated proceeding is "to reduce, if not completely eliminate, contested adoption." Frondorf and Harper, Arizona's New Face of Adoption, A.S.U.L.J., 1972, No. 1, 127 at 149.

The New Mexico statute on "Termination of Parental Rights" is not a bifurcated proceeding. It does not provide for disposition of the child's custody prior to an adoption proceeding. It appears to be, in effect, an adoption proceeding within an adoption statute. Its interpretation was confusing in the court below. It is vague, indefinite, impractical, and unrealistic in this court.

Section 22–2–23, supra, is invalid for the following reasons:

*First*: The purpose of this section was to terminate parental rights with respect to a minor child. It was not intended to create a parent-child relationship between the "initiator" of the application and the minor child. This adoptive parent-child relationship is the purpose of the adoption statute. By declaring "Termination" to be "adoption," the statute forces the natural parents and the adoptive parents to endure the pains of a contested adoption by "initiators" not allowed to adopt a minor child.

The "initiator" of the application for termination of parental rights is not a person who may adopt under § 22–2–24, supra, of the "Adoption Act."

An "initiator" under § 22–2–23(B)(2), (3), supra, may be "the custodian of a minor" or "an agency."

The "custodian" is defined as " . . . a person having custody of an individual, a guardian of the person of an individual, and a guardian ad litem for an individual;" Section 22–2–21(J), N.M.S.A.1953 (Vol. 5, Supp.1971).

"An agency" is defined as "any person certified, licensed or otherwise specially empowered by law to place minors for adoption." Section 22–2–21(C), supra.

It is obvious that such "initiators" are not allowed by law to terminate a natural parent's rights in order to create an artificial adoptive parent-child relationship. The "initiators" are allowed only to seek termination.

The vague and indefinite language of the statute makes § 22–2–23, supra, unconstitutional. State v. Prince, 52 N.M. 15, 189 P.2d 993 (1948). A person seeking "termination of parental rights" should know whether such proceeding results in adoption. State v. McMaster, 259 Or. 291, 486 P.2d 567, 576 (Or.1971) [concurring opinion].

*Second*: Section 22–2–23, supra, sets forth three reasons under which the court can terminate parental rights. Termination is the only issue in the proceedings. The qualification of the "initiator" is not an issue. Any unfit person in actual phys-

ical custody of a minor child, can initiate proceedings to terminate a mother's right to her own son. If successful, the "initiator" becomes the parent of the child.

■ *Third*: Section 22–2–23, supra, provides for a judgment by adoption without consent of the parents. "Parental rights" is defined as ". . . all rights of a parent with reference to a minor, *including parental right to control,* or *to withhold consent to an adoption,* or to receive notice of a hearing on a petition for adoption;" [Emphasis added] Section 22–2–21(I), supra. Consent is at the very foundation of adoption statutes. Before the trial court can consider the merits of an adoption proceeding, the court must first determine whether the consent of the parent has been given or dispensed with. Nevelos v. Railston, 65 N.M. 250, 335 P.2d 573 (1959).

■ A statute which deprives a parent permanently of his child without consent, or without notice or opportunity to be heard, is void as an unconstitutional deprivation of right without due process of law. In re Mayernik, 292 S.W.2d 562 (Mo. 1956); Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). See, Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). In re Adoption of K., 417 S.W.2d 702, 709 (Mo.App. 1967); Annot. 45 A.L.R.2d 1379, 1380 (1956). In re Adoption of K. said:

> Adoption involves the dissolution of a constitutionally protected relationship, and unless the parents consent, or there is a substantial showing of some condition dispensing with the necessity of consent, the court has no power to enter a decree of adoption. Adoption may not be decreed simply to enhance the moral and temporal welfare of the child.

*Fourth*: The judgment of the trial court reads:

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the parental rights of Respondent . . . to the minor child . . . be and they are hereby terminated.

Under this judgment, the sole question was whether the facts warrant the court in completely severing all ties between the mother and her son. The welfare of the child is not controlling.

"Effect of Judgment of Adoption" was not included in the judgment. This is a clear indication that § 22–2–23 is vague, indefinite and uncertain. The child has been placed in limbo, without natural or adoptive parents, and without custody or guardianship. It denies the child the possibility of being placed in a new home and becoming part of a family. For many years, he may be cared for in an institution or be transferred from foster home to foster home. The judgment against respondent is a violation of the due process clause of Art. II, § 18 of the Constitution of New Mexico. See, Robinson v. State, 34 N.M. 557, 287 P. 288 (1930); Annot. 76 A.L.R. 662.

■ Furthermore, if § 22–2–23 is only a statutory proceeding for "Terminating Parental Rights," and not an "Adoption," it does not come within the scope of the title of the Act and violates Art. IV, § 16 of the New Mexico Constitution.

Other reasons could be stated which declare § 22–2–23, supra, invalid. We do not deem it necessary.

(2) *The Trial Court Lacked Jurisdiction to Terminate the Mother's Rights to her son.*

The mother requested the trial court to find "that Respondent will not consent to her child's adoption by Applicants or by anyone else." The trial court made no finding on consent and did not "refuse" this request as provided by § 21–1–1(52)(B)(a)(5), N.M.S.A.1953 (Repl.Vol. 4). The undisputed evidence supports this requested finding and we affirm it. Boswell v. Rio De Oro Uranium Mines, Inc., 68 N.M. 457, 362 P.2d 991 (1961); Lamonica v. Bosenberg, 73 N.M. 452, 389 P.2d 216 (1964).

■ Consent to adoption is a jurisdictional requirement. Courts are powerless

to alter the natural parent-child relationship and create an artificial one unless consent is unnecessary or waived. Barwin v. Reidy, 62 N.M. 183, 307 P.2d 175 (1957); Hill v. Patton, 43 N.M. 21, 85 P. 2d 75 (1938); Onsrud v. Lehman, 56 N.M. 289, 243 P.2d 600 (1952).

■ The trial court did not find that consent was unnecessary, dispensed with or relinquished. The trial court lacked jurisdiction to terminate the mother's right to her son.

(3) *The Judgment of the Trial court was Contrary to Public Policy.*

■ The judgment terminating the mother's rights to her son was contrary to public policy because the Hueys, as applicants, knowingly and willfully violated a formal written agreement with the Department of Public Welfare, entitled "Child Welfare Services Agreement for Foster Family Care."

On June 2, 1969, the Hueys as foster father and foster mother, signed the agreement, supra. They agreed to comply with all the conditions relating to the placement with them of foster children. Of the ten provisions stated, the following are pertinent:

* * * * * *

2. Leave to the agency the making of plans for foster children, including . . . return to parents. . . .

3. Engage in no adoptive planning for foster children except with agency authorization.

* · * * * * *

7. Report promptly illnesses, behavior and adjustment problems of foster children, and consult with the agency on their medical need.

* * * * * *

9. Treat information about foster children and their families in strictest confidence, to be shared only with the agency.

The Hueys obtained the son as foster parents under the above agreement. They retained a copy of the agreeement. They read it before they signed it. They understood it. They agreed to comply with it. They were aware that the minor child was to be permanently returned to the mother on Friday, March 10, 1972. They were told that the foster plan was terminating. Through Health and Social Services, the mother had been picking up her child on Friday for week ends, and the caseworker told Mrs. Huey that the Department had decided the mother wanted her child and it was going to give him to her right away. On March 13, 1972, in violation of the written agreement, the Hueys filed their application for termination of the mother's rights to her own son.

When Mrs. Huey was asked if her petition was a breach of the agreement, she said:

No, ma'am. But you can't take a child and keep him for three years and not grow to love him. Especially when his mother has never had him in the first place.

The trial court questioned Mr. Huey about why he refused to follow the direction of the Welfare Department that the child be returned to his mother. His first sentence of a long explanation was:

We had been, have been with the child for three years and all and we felt that he had grown to be part of our family and all.

He elaborated on illnesses, behavior and adjustment problems, but this all required consultation with the Department of Public Welfare. Instead of treating their information in strictest confidence, they filed an application for termination of the mother's rights under § 22–2–23(A)(3), supra. This section reads as follows:

(3) The minor is without proper parental care and control, or subsistence, education or other care or control necessary for his physical, mental or emotional health or morals, by reason of the misconduct, faults or habits of the parent or the neglect or refusal of the parent, when able to do so, to provide them

or by reason of physical or mental incapacity of the parent to provide necessary parental and other care for the minor, if the court finds that the conditions and causes of such behavior, neglect or incapacity are irremediable or will not be remedied by the parent, and that by reason thereof the minor is suffering or will probably suffer serious physical, mental or emotional harm.

The trial court made findings of fact and conclusions of law which cover only the provisions of subsection (A)(3), supra. On appeal, the mother challenged most of the findings. There is merit to the challenges. But we are concerned with the failure of the trial court to adopt certain requested findings of the mother as Respondent which challenge the right of the trial court, as a matter of public policy, to hear an application filed by Huey.

The requested findings are as follows:

10. That in August, 1971, at a full staff meeting, the New Mexico Department of Health and Social Services made a decision to return the child permanently to Respondent. That in this regard, a plan of reacquainting the child with his family through increased visiting was begun.

11. That Applicants acquiesced in this plan, and cooperated fully by preparing the child to visit his family, and encouraging and approving of the visits. That the plan was successful and March 10, 1972 was the date fixed to permanently return the child to his home.

\* \* \* \* \* \*

21. That prior to accepting [the minor child] into their foster home, Applicants Gerald Huey and Bonnie Huey signed an agreement with the New Mexico Department of Health and Social Services, agreeing, in part, to:

2. Leave to the agency the making of plans for foster children, including parental visiting, placement changes, and return to parents and relatives, and cooperate with the agency in carrying out these plans.

3. Engage in no adoptive planning for foster children except with agency authorization.

These requests were not "refused" as provided by § 21-1-52(B)(a)(5), supra, and since the undisputed evidence supports these requests, we affirm them.

The question now arises: Is the judgment of the trial court contrary to public policy in New Mexico. We say "yes."

The public policy of this state is derived directly or by clear implication from the established law of the state as found in its constitution, statutes and judicial opinions. Barwin v. Reidy, supra.

There was "unjust overreaching" here by foster parents, as there was by natural parents in Barwin v. Reidy, supra.

Under the statutes of our state, the mother is the natural guardian of her children, and shall have the duty of care and education of her children. Section 32-1-1; N.M.S.A.1953 (Vol. 5). The Department of Public Welfare is charged with administration and supervision of all child welfare activities, service to children placed for adoption, service and care for children in foster family homes. It formulates detailed plans. It makes rules and regulations, and it may take such action deemed necessary or desirable to carry out the provisions of the Welfare Act, which are not inconsistent with it. Section 13-1-4(c), (d), N.M.S.A.1953 (Repl.Vol. 3). In addition, the provisions of the Adoption Act assist in the protection of parental rights.

On the issue of contracts, it is improper for courts to relieve either party to a contract from its binding effect where it has been entered into without fraud or imposition, and is not due to mistake against which equity will afford relief. In re Tocci, 45 N.M. 133, 112 P.2d 515 (1941); Herrera v. C & R Paving Company, 73 N.M. 237, 387 P.2d 339 (1963).

The Hueys were bound by their agreement with the Department of Public Welfare. As between the two, the Department of Public Welfare was entitled to the pos-

session of the minor child. New Mexico Department of Public Welfare v. Cromer, 52 N.M. 331, 197 P.2d 902 (1948).

The minor child was born April 7, 1968. Because the mother and son were ill, the Department of Public Welfare advised the mother it would be helpful if she would allow someone to care for the child until she got well. On July 3, 1968, the mother executed a "Release For Placement and Transportation." By this document, the mother consented to boarding her son in a home selected by the Department, and consented to medical care for her son by a physician. No consent was given for adoption. Thereafter, the Hueys became foster parents pursuant to the agreement entered into with the Department. The mother of the child, being the third party beneficiary of the Huey agreement, was entitled to its benefits. McKinney v. Davis, 84 N.M. 352, 503 P.2d 332 (1972).

In addition, we have adopted the philosophical principle that " ' . . . the primal instincts and the natural and legal rights of the parents may not be lightly brushed aside . . . ' All courts recognize that . . . best interest of the child is not measured altogether by material and economic factors—parental love and affection must find some place in the scheme and we all know this item covers a multitude of weaknesses." Hill v. Patton, supra.

The judgment of the trial court is reversed, the proceedings to terminate the mother's right to her son is dismissed, and the son must be returned to the mother forthwith.

It is so ordered.

LOPEZ, J., concurs.

HERNANDEZ, J., specially concurs.

HERNANDEZ, Judge (specially concurring).

I concur in the reversal of the lower court's decision and the order to return the child to his natural mother. I do not agree that the termination statute is unconstitutional; I believe this case should be decided on non-constitutional grounds. In the following opinion I have first set out my disagreements with Judge Sutin's opinion and then have discussed the reasons why I think the trial court's judgment should be reversed.

(1) *The vagueness of the termination statute.*

I do not agree that § 22–2–23, supra, is vague and indefinite. Its sole purpose is to relieve unfit parents of all parental rights and responsibilities. Therefore, the phrase "has the same effect" as used in subsection E of the termination statute, in my opinion, must be construed to incorporate only the language of subsection A(1) of the adoption statute, § 22–2–33, N.M.S. A.1953 (1971 Supp.Vol. 5). Under the statute there may well be some period of time after the natural parent's rights are terminated and before an adoption proceeding is completed and parental rights in others created, if ever. I do not see this as a constitutional defect. In other words, a statute such as this need not create parental rights in other persons to be constitutional.

(2) *The problem of consent and notice under § 22–2–23, supra.*

In my opinion Judge Sutin erroneously mixes the two entirely separate concepts of notice and consent in determining that the statute "deprives a parent permanently of his child without consent, or without notice or opportunity to be heard." Section 22–2–23, supra, does not dispense with notice to the natural parents with respect to a *termination* hearing. Subsection D, § 22–2–23, supra, requires that:

"Notice of the filing of the application, and of the time and place of the hearing, accompanied by a copy of the application shall be given by the applicant *to the parents of the minor,* the custodian of the minor, any person appointed to represent any party and any other person the court orders. [Emphasis mine]

Notice, however, has nothing to do with parental consent. The termination statute sets out clear guidelines under which a parent's rights in a child may be cut off. The consent of the parents is not required. Virtually every state adoption statute in this country contains some grounds under which adoption petitions may be granted without the consent of the parents.

" . . . [M]ost jurisdictions recognize that there are some situations where express consent is not required. In those situations, consent is either implied on the basis of neglectful conduct on the part of the natural parent or dispensed with entirely on the basis of conduct or occurrences which, while involuntary, have the same consequences toward the child as neglectful conduct." Katz, When Parents Fail: The Law's Response to Family Breakdown, 115–116 (1971).

The New Mexico adoption statute contains certain specified grounds under which consent to the adoption petition from "a parent who has abandoned or deserted the minor to be adopted" is not required. Section 22–2–26(A), N.M.S.A.1953 (1971 Supp.Vol. 5).

There are times when the overwhelming interests of the child require that his family situation be remedied irrespective of the consent of his natural parents. The fact that parental consent is not required under § 22–2–23, supra, does not render the statute unconstitutional on either due process or "public policy" grounds.

I agree that the decision of the lower court should be reversed; however, I would reverse solely for the reasons set out below.

This appeal is the first proceeding to be brought under the termination statute, and as such involves a number of questions of first impression. Section 22–2–23, supra, was enacted as a part of the revision of the New Mexico adoption statute and provides that upon a proper showing, certain specified parties may bring an action in district court requesting that a natural parent's parental rights in his or her children be severed. The effect of such a termination is nothing less than complete and final extinction of a parent's legal rights in a child.

As grounds for termination of parental rights, an applicant under § 22–2–23, supra, must show, in the alternative, that:

"(1) cause [for termination] exists under any law, other than the Adoption Act;

"(2) the minor has been abandoned by the parent; or

"(3) the minor is without proper parental care and control, or subsistence, education or other care or control necessary for his physical, mental or emotional health or morals, by reason of the misconduct, faults or habits of the parent or the neglect or refusal of the parent, when able to do so, to provide them or by reason of physical or mental incapacity of the parent to provide necessary parental and other care for the minor, if the court finds that the conditions and causes of such behavior, neglect or incapacity are irremediable or will not be remedied by the parent, and that by reason thereof the minor is suffering or will probably suffer serious physical, mental or emotional harm."

The Hueys are licensed by the New Mexico Health and Social Services Department (HSSD) as foster parents. As such they take children assigned to them under written agreement with HSSD and provide parental care for temporary periods for children whose parents are unable to do so. The record reveals that the Hueys have taken in several children under the foster parent plan including the child in question here, Jesse Lente.

Because of other medical problems which required immediate attention, Mrs. Lente remained in the hospital for a substantial period after the birth of Jesse and was unable to care for him. Under the terms of a written agreement with HSSD Mrs. Lente voluntarily gave up care of the

child for "boarding home placement . . . . in a home to be selected by the New Mexico Department of Public Welfare [HSSD]." It was apparently understood by both Mrs. Lente and representatives of HSSD at the time of the signing of this agreement that her relinquishing of custody was to be temporary until such time as her medical and financial situation permitted her to properly care for the child.

Sometime after Mrs. Lente had released Jesse to HSSD, HSSD sent Jesse to the Hueys under the standard foster parent written agreement. Except for short periods of visitation with Mrs. Lente the child has remained with the Hueys since that time.

After Mrs. Lente was released from the hospital and had regained her health and secured some financial support, she tried to get her child back. Through a series of almost incredible mixups HSSD lost track of the child, and as a consequence Jesse remained in the Huey home for over two years despite Mrs. Lente's efforts to locate him and to regain custody. When HSSD finally relocated Jesse, a staff conference was held in which it was determined that the child should be returned to his mother. The department notified both Mrs. Lente and the Hueys of the decision and set a date for Jesse's return. Shortly before that date, the Hueys brought this action.

The trial court found in favor of the Hueys and ordered the parental rights of Mrs. Lente terminated. I would reverse for two reasons. First, the Hueys were given temporary custody of Jesse subject to the provisions of a written agreement establishing an agency relationship between themselves, HSSD and Mrs. Lente. By bringing this action they breached the duty of loyalty to principal inherent in such situations. Second, the findings of the trial court relating to the inability of Mrs. Lente to be a fit and proper parent for Jesse are not supported by substantial evidence in the record.

(1) *The written agreement between the Hueys and HSSD.*

The agreement executed between the Hueys, as foster parents, and HSSD provides, in part, that:

"Applicants agree that they will:

. . . . .

"2. Leave to the agency the making of plans for foster children, including parental visiting, placement changes, and *return to parents and relatives*, and cooperate with the agency in carrying out these plans.

"3. *Engage in no adoptive planning for foster children except with agency authorization.*" [Emphasis mine]

Petitioners argue that this agreement is irrelevant to this action between the Hueys and Mrs. Lente. I disagree. The contract is relevant and must be read in conjunction with the agreement signed by Mrs. Lente when she voluntarily relinquished custody of Jesse to HSSD for temporary boarding purposes. Since I believe that both agreements are relevant to this action this court must characterize the relationship existing between Mrs. Lente and HSSD and, secondarily, between HSSD and the Hueys. Read together, I conclude that both documents create what is in essence an agency relationship between the parties.

"It is not necessary that the parties intend to create the legal relationship of agency or to subject themselves to the liabilities which the law imposes upon them as a result of it, but only that the principal has in some manner indicated that the agent is to act for him, and that the agent so acts or agrees to act on his behalf and subject to his control."

Totah Drilling Company v. Abraham, 64 N.M. 380, 328 P.2d 1083 (1958). Mrs. Lente, as principal, contracted with HSSD for the temporary boarding care of her child while she remained in the hospital. The agreement was understood by both parties to mean that Mrs. Lente would resume caring for her child at such time as

she was physically able. HSSD assumed the responsibility for seeing to the physical needs of the child. Since in practice HSSD does not have the facilities or personnel for actual day-to-day care of children, the department in turn entered into an agreement with the Hueys for the care of the child under an agreement expressly reserving to HSSD and to the child's relatives the responsibility for planning for the child's future, including the return of the child either to the agency or to the child's parents. Thus, the Hueys were agents of HSSD for the purpose of providing the day-to-day care of the child and were sub-agents of Mrs. Lente because of her agreement with HSSD. The Restatement of Agency defines a sub-agent as:

". . . a person appointed by an agent empowered to do so, to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily liable." Restatement (Second), Agency § 5(1) (1958).

If the Hueys were agents of HSSD and sub-agents of Mrs. Lente, it is clear that they occupied the position of a fiduciary with respect both to the department and to Mrs. Lente and were subject to the various duties of fiduciaries including the duty of loyalty. "The general rule is that he who undertakes to act for another in any matter of trust or confidence shall not in the same matter act for himself against the interest of the one relying upon his integrity." Rice v. First National Bank, 50 N.M. 99, 171 P.2d 318 (1946); Canfield v. With, 35 N.M. 420, 299 P.2d 351 (1931).

The Hueys owed a duty of loyalty both to HSSD and to Mrs. Lente and by filing this action breached that duty. That the Hueys may have initially entered into the agreement in good faith and with no intent to breach is not material. "It is of little moment whether an agreement of agency is made with fraudulent intent, or the agent succumbs to covetousness after he enters upon his duties . . ." Rice v. First National Bank, supra. Accordingly,

since the initiation of this action and the attempt to terminate Mrs. Lente's parental rights occurred while the Hueys were in a fiduciary relationship with her, they should not be permitted to prevail in the matter.

I do not believe that it is either appropriate or wise to permit persons who take children under the clear and unambiguous terms of the HSSD foster parent agreement to maintain actions to terminate the parental rights of natural parents who have turned their children over to HSSD under what they assume to be a temporary period subject to their wishes and desires. I believe that to hold otherwise would impair the HSSD foster parent plan and would subject parents who agree to temporary boarding of their children to the possible permanent loss of their rights in their children at the wish of whoever happens to have physical custody of the child.

(2) *Substantial Evidence to Support the Relevant Findings of Fact.*

As a threshhold matter, a large part of the focus of the trial court's findings and the greater part of the petitioners' presentation of evidence involved matters which I would hold to be irrelevant as a matter of law. Findings of the trial court 50 through 59 (numbers converted from roman numerals) deal with the Huey's suitability as adoptive parents. These findings are not relevant to a proceeding under § 22–2–23, supra. By the clear and unambiguous language of the statute, the sole consideration to be applied in termination proceedings is the relationship of "a parent with respect to a minor." § 22–2–23, supra. A comparative analysis as to which of the parties may provide the better custody for the child is not within the scope of this proceeding. Cf. Nevelos v. Railston, 65 N.M. 250, 335 P.2d 573 (1959).

Termination of the rights of a natural parent in a child is not a matter to be taken lightly. As our Supreme Court pointed out in Nevelos v. Railston, supra, "[t]he relationship between parent and child is a bundle of human rights of . . . fundamental importance" and because of this

importance any statutes which purport to alter or abolish this relationship "being in derogation of common law are to be construed strictly *in favor of the parent and the preservation of the relationship*." [Emphasis mine]

Because of the fundamental importance of a termination action and because there is nothing in the express language of the statute which persuades me that the legislature intended a different burden I see no reason to depart from the burden of proof imposed by the Supreme Court in other actions of a similar nature which involve the severing of the parent's rights. The burden of proof to be assumed by any party seeking termination is that unfitness of the natural parent must be demonstrated by evidence which is clear and convincing. Nevelos v. Railston, supra; Cf. Petition of Quintana, 83 N.M. 772, 497 P.2d 1404 (1972). In Nevelos the Supreme Court used the phrases "clear and satisfactory, something almost akin to proof beyond a reasonable doubt, or by 'clear and indubitable evidence.'" I am convinced that what the Court in Nevelos meant was that burden of proof which is "something stronger than a mere 'preponderance' and yet something less than 'beyond a reasonable doubt.'" In re Palmer, 72 N.M. 305, 383 P.2d 264 (1963); Lumpkins v. McPhee, 59 N.M. 442, 286 P.2d 299 (1955). Nothing in this record indicates that the trial court applied this stricter burden of proof.

None of the findings of fact relevant to the natural mother's relationship to the child and her ability to properly care for the child are supported by substantial evidence in the record. Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate support for a conclusion." Samora v. Bradford, 81 N.M. 205, 465 P.2d 88 (Ct.App.1970); McCauley v. Ray, 80 N.M. 171, 453 P.2d 192 (1968).

Findings 42 through 49 are mere recitations of the applicable statutory considerations imposed by § 22–2–23, supra, phrased in conclusory language. An appellate court is not bound to accept such conclusions as ultimate facts. Gillespie v. O'Neill, 38 N.M. 141, 28 P.2d 1040 (1934).

Findings of fact 5 through 9, 25 through 31, and 34 through 39 concern the birth of Mrs. Lente's seven children and their illegitimacy. I am not disposed to say conclusively that illegitimacy of large numbers of children may not be a factor in an overall determination of parental fitness; but as the trial court itself noted, under the termination statute,

". . . the important test here, evidently [sic] is assuming you have the situation as described in the statute, the Court has to find that it either cannot be remedied or will not be remedied."

The uncontradicted testimony of Mrs. Lente was that she submitted to a tubal ligation, an operation which renders her incapable of bearing more children, shortly after the birth of Jesse. The findings of fact relating to the illegitimate births of Mrs. Lente's children do not support the conclusion of law that her behavior is "irremedial and will not be remedied."

Finding of fact number 40 states in part that Jesse "visited with Respondent Mary Lente, and was compelled to sleep in the same room with Mary Lente who slept with another man. . . ." A thorough search of the transcript reveals that the only support for this finding was the assertion of the Hueys that Jesse, the five year old subject of this action, had discussed the sleeping arrangements in Mrs. Lente's home and that he had "another daddy." No other witness gave direct testimony as to this "other man"; the representative of HSSD, who supervised both regular and unannounced visits of the Lente home, asserted that ". . . we do make unannounced visits and we have several times and there hasn't been a man around." If this finding was designed to indicate sexual irresponsibility on the part of Mrs. Lente, it was contradicted by the assertion of the casework supervisor who testified that "We don't see Mrs. Lente as being promiscuous, and I have

never viewed her as promiscuous. And I don't think my workers have viewed her as promiscuous." I conclude that the hearsay evidence on this point provided by Mr. and Mrs. Huey as related to them by a five year old child in the face of the contradictory evidence provided by the HSSD representatives who had observed the Lente home as a part of their official duties is not "such relevant evidence as a reasonable mind might accept as adequate support for a conclusion." Samora v. Bradford, supra.

The findings of the trial court with respect to the adequacy of the Lente home, the financial situation of Mrs. Lente, the education of the children and the present habits and conduct of Mrs. Lente have no basis in competent evidence in the record. The uncontradicted evidence of the HSSD representatives and the visiting nurse, Mrs. Pecha, lead to the conclusion that while clearly not affluent, Mrs. Lente was providing an adequate home for the children, was looking after their education, and was capable of taking proper steps to insure their health and regulate their conduct. The mere fact that she was and had been a welfare recipient is not evidence of unfitness. Findings for which there is a total lack of support in the record may be set aside. Lumpkins v. McPhee, supra; Ortega v. Ortega, 33 N.M. 605, 273 P. 925 (1928).

To summarize briefly, in termination proceedings brought under § 22-2-23, supra, the only evidence which should properly be considered by the trial court is that evidence which is relevant to the parent's behaviour, attitude and relationship with the child. The court may not balance the backgrounds of the parties and decide which party may provide the "better" environment for the child. If such considerations are applicable they are applicable in adoption proceedings and not in actions brought to terminate the rights of a natural parent.

The evidence as to the parent's fitness, must be such as to clearly and convincingly persuade the fact finder that the parent is unfit. A mere preponderance of the evidence is not sufficient.

Finally, findings by the trial court must be supported by substantial evidence in the record and may not be mere conclusions drawn in the language of the termination statute.

For these reasons only, I agree that the judgment of the lower court should be reversed and that the child should be immediately returned to his natural mother.