648 P.2d 1180

**In the Matter of Jane DOE, a child.**

**STATE of New Mexico, ex rel., DEPARTMENT OF HUMAN SERVICES, Petitioner-Appellee,**

v.

**Elodia MINJARES, Respondent-Appellant.**

**No. 4975.**

Court of Appeals of New Mexico.

Nov. 17, 1981.

Jeff Bingaman, Atty. Gen., Bruce M. Burwell, Asst. Atty. Gen., Santa Fe, for petitioner-appellee.

Larry R. Hill, Alamogordo, for respondent-appellant.

## OPINION

SUTIN, Judge.

The trial court entered judgment that the parental rights of Elodia Minjares be forever terminated with a minor child and that its legal custody be placed with the Department of Human Services (DHS) for purposes of adoption of the child, with physical custody to remain in foster parents pending adoption. Elodia appeals. We reverse.

The trial court found:

On May 9, 1975, a 10 month old child, having been born June 17, 1974, was removed from Elodia's home because this child and another had been left alone. On May 13, 1975, the child was placed in the

home of a family and has remained with this family to the present time.

On July 9, 1975, DHS was granted custody of the child for foster home placement for an indefinite period not to exceed one year. Subsequent extensions were made and on July 11, 1979, the State filed this action to terminate Elodia's parental rights.

Elodia kept an unclean, unkempt home although there has been some improvement. Three of her sons had been adjudicated delinquent children. On occasion she would leave some of her small children alone at home without supervision.

The child had a chronic hip dislocation which required care at Carrie Tingley Childrens Hospital and was taken there for all required visits by the family who were foster parents. The child is well adjusted and functions as a member of this family, does not know her mother's name nor the names of her brothers and sisters except one, but she does know the names and ages of the children of the foster parents, the school they attend and in what year of school each is. The child looks upon Elodia as a stranger and the foster parents as her parents.

Elodia attended scheduled visits with the child sporadically with no interaction between mother and daughter. Elodia would not provide a proper environment for the child nor proper care, nurturing, discipline and supervision were the child returned to her.

The trial court concluded that the parent/child relationship between Elodia and her daughter had disintegrated to a point where there was no relationship between them; that the conditions of neglect which existed at the time the child was removed from Elodia's home are unlikely to change in the foreseeable future; that the child has lived in foster placement for five of her six years of life and that a real parent/child relationship has developed between the foster parents and the child.

Section 40–7–4, N.M.S.A.1978, entitled "Termination of parental rights" reads in pertinent part.

A. The rights of a parent * * * with reference to a child may be terminated by the court * * *. In proceedings to terminate parental rights, *the court shall give primary consideration to the physical, mental and emotional welfare and needs of the child.*

B. The court shall terminate parental rights with respect to a minor child when:

\* \* \* \* \* \*

(3) the child is a neglected * * * child as defined in Section 32–1–3 NMSA 1978 and *the court finds that the conditions and causes of the neglect * * * are unlikely to change in the foreseeable future despite reasonable efforts by the department * * * to assist the parent in adjusting the conditions which render the parent unable to properly care for the child*; or

(4) the child has been placed in foster care by a court order * * * and the following conditions exist:

(a) the child has lived in the foster home for an extended period of time;

(b) *the parent/child relationship has disintegrated*;

(c) a psychological parent/child relationship has developed between the foster family and the child;

(d) if the court deems the child of sufficient capacity to express a preference, the child prefers no longer to live with the natural parent; and

(e) the foster family desires to adopt the child.

\* \* \* \* \* \*

J. The grounds for any attempted termination must be proved by clear and convincing evidence.

\* \* \* \* \* \*

L. *A judgment of the court terminating parental rights divests the parent and the child of all legal rights, privileges, duties and obligations * * * with respect to each other, and dispenses with both the consent of, and the requirement of notice to, that parent whose relationship is terminated by the judgment for a subsequent adoption proceeding.*

A "neglected child" as defined in § 32–1–3(L) is a child

* * * * * *

(2) who is without proper parental care and control or subsistence, education, medical or other care or control necessary for his well-being *because of the faults or habits of his parent * * * or his neglect or refusal, when able to do so, to provide them.* [All emphasis added.]

▇▇ In summarizing the law applicable to termination of parental rights, the public policy of this State is that primary consideration must be given to the welfare and needs of the child. Termination of parental rights is proper if (1) the child is a neglected child or (2) the child has been placed in foster care by court order subject to the existence of five conditions. If a natural mother is to have her rights foreclosed, strict compliance with the statute must be had and full effect given to its meaning. We hold that the requirements of these statutes have not been met.

A. *Elodia's child was not a neglected child.*

▇▇ If we accept the court's conclusions of law as additional findings of fact, it found:

On May 9, 1975, the child, then ten months old, was removed from the home of Elodia because the child and a three year old sister had been left alone by Elodia. The conditions of neglect which existed at the time the child was removed from Elodia's home are unlikely to change in the foreseeable future.

To conclude that parental rights should be terminated on the grounds of neglect as stated in § 40–7–4(B)(3) and § 32–1–3, the trial court must make the following findings:

(1) That "the child *is* a neglected child." The statute reads in the present not in the past tense. It does not mean that a child which may have been a neglected child five years before the hearing remained a neglected child five years later, especially so when the child was removed from her mother's home at the age of ten months and placed in a different environment thereafter. In other words, a child, who has lived with foster parents for five years prior to a hearing, cannot be classified as a neglected child. Whether the child would have been neglected under parental care if returned to Elodia is an unknown fact.

This is not a proceeding in which a determination is made whether DHS is entitled to the custody of the child. We are at that point where DHS seeks the total permanent dissolution of the relationship of natural mother and child.

On October 26, 1977, DHS filed an Application for Termination of Parental Rights. On May 8, 1978, a different judge entered an Order that denied the State's Petition to Terminate the Parental Rights of Elodia; that such parental rights should continue in full force and effect and that custody of the child remain with DHS subject to a hearing to be held on July 16, 1978. On July 24, 1978, custody was continued in DHS for one year from July 16, 1978. Before the expiration of the year, on July 5, 1979 in open court, and on July 11, 1979, in the district court, DHS again filed the present independent Application for Termination of Parental Rights under a different file number. The present district judge, absent any change in conditions affecting the parental rights of Elodia, did terminate her parental rights on October 30, 1980.

A child which may have been a neglected child on May 9, 1975, at the age of ten months, was not a neglected child on May 8, 1978, when DHS's first Application for Termination of Parental Rights was denied. Nothing appears of record from May 8, 1978 to October 30, 1980, which changed the status of the child to that of a neglected child for purposes of terminating Elodia's parental rights.

All that we know from the record on child neglect is that on May 9, 1975, Elodia was away from home for an hour or so. She was shopping by way of walking a long distance to provide for her children. The weather was too hot to carry the child. Her home was unclean and unkempt. A

serious question arose whether the child was then a neglected child. In *Augustine v. Berger*, 88 Misc.2d 487, 388 N.Y.S.2d 537 (1976), the court held that a child, under similar circumstances, was not a neglected child.

Under the statute, the child must be a neglected child at the time of the hearing. In the instant case, the court failed to find that the child *is* presently a neglected child. Of course, such a finding could not be made under the evidence presented.

(2) That the Department made reasonable efforts to assist Elodia "in adjusting the conditions which render the parent unable to properly care for the child." No such finding was made.

(3) That "because of the faults or habits of [her] parent," the child was without proper parental control. No such finding was made nor could one be made for reasons heretofore stated.

(4) That "[her] neglect or refusal whenever able to do so," did not provide them with proper parental care and control. No such finding was made or could be made.

For proper findings see, *State ex rel., Etc. v. Natural Father*, 93 N.M. 222, 598 P.2d 1182 (Ct.App.1979).

The findings of the court were not sufficient to establish that Elodia's child was a neglected child. The necessary findings on that issue do not exist. While under the care of foster parents, she was in fact not a neglected child. Elodia's rights could not be terminated under this section of the statute.

**B.** *The parent/child relationship of Elodia and child could not disintegrate because it did not exist.*

To terminate the parental rights of Elodia by reason of foster care placement of the child, five conditions must be met. The second one is: "The parent/child relationship has disintegrated." The trial court concluded that "The parent/child relationship between Elodia and [her child] has disintegrated to a point where there is no

relationship between them." To support this conclusion, the trial court found:

\*    \*    \*    \*    \*    \*

12. [The child] does not know ... [Elodia's] name and except for one of her blood siblings does not know the names of her natural siblings.

\*    \*    \*    \*    \*    \*

14. [The child] looks upon \* \* \* [Elodia] as a stranger and upon \* \* \* [foster parents] as her parents.

15. \* \* \* [Elodia] has attended scheduled visits with [her child] sporadically.

16. During visits by \* \* \* [Elodia] with [her child] there was no interaction between mother and daughter.

The disintegration of a parent/child relationship is difficult of definition and application. To "disintegrate" is defined as: "To break or decompose [some thing] into constituent elements or into parts [their attacks gradually disintegrated the government]" or "to break or separate into constituent elements or parts (with the rise of nationalism, the colonial empires disintegrated)." Webster's Third New International Dictionary Unabridged (1977), p. 650.

Biologically, the relationship of mother and child cannot be broken or separated. Legally, it can. If the relationship is disintegrated, Elodia and her child are no longer called "mother and child." They are two separate persons, each of whom is divested "of all legal rights, privileges, duties and obligations \* \* \* with respect to each other \* \* \*". Section 40–7–4(L), *supra*.

■ It is not necessary to determine the standards essential to the disintegration of a parent/child relationship. Neither have we found any authority that makes this determination. We do hold a parent/child relationship must develop before it can disintegrate.

Juan Sosa, a clinical psychologist, testified on behalf of the child and DHS. When asked his opinion as to what makes a parent/child relationship, he said:

A parent-child relationship is made up by those people who offer nurturance, sup-

port, emotional-physiological support to a child that's born. It's the people who are there to train, correct, help, be able to relate emotionally and socially to a child.

He was asked these questions to which he gave these answers:

Q. Then, doesn't the fact that * * * [the foster parents] * * * had custody at the time of the evaluation for four and a half years, that the child speaks a different language than her mother and that Mrs. Minjares did not have the child overnight and she had only been granted visits for two or three times a month for two hours, go against this kind of relationship which you call the parent-child relationship?

A. That's right. *She had no opportunity to form one.*

* * * * * *

Q. What minimal criteria would you need to determine that a parent-child relationship exists between [the child] and her mother?

A. Well, obviously you have established that there was no opportunity for this to develop and *I concur and agree with you wholeheartedly. She did not have the opportunity to develop this, so there's obviously no relationship.* You stated it yourself.

* * * * * *

Q. Isn't it true that the absence of a parent-child relationship between Mrs. Minjares and [the child] can be directly attributable to the long-term foster placement with minimal contact between the child and her mother?

A. *That's right.*

Q. In fact, there had been no quality time, or what you call quality time or prime time for such a relationship to develop?

A. *That's right.*

* * * * * *

Q. What other reasons led you to make your conclusion that no parent-child relationship exists?

A. *I think you mentioned them all.*

* * * * * *

[All emphasis added.]

At the time the child was taken from Elodia's home without her knowledge or consent, Elodia was poverty stricken and lived alone with her children. DHS could not find Spanish foster parents for the child. Neither did it find foster parents in Alamogordo where Elodia lived. The child was placed in the custody of non-Spanish foster parents who lived in Ruidoso, far removed from the mother. DHS continually used the courts to extend this foster parent/child relationship. As a result, DHS deprived Elodia of any opportunity to establish a parent/child relationship.

Common sense dictates that a 10 month old child, taken from a Spanish mother and placed with non-Spanish foster parents for the next five years of the child's life at a long distance from a poverty stricken mother, can become, as the court found, a well adjusted child who functions as a member of the family of foster parents. It naturally follows, as the court further found, that the child did not know her natural mother's name, nor the names of her children. Of course, the child knew the names and ages of the foster parents' children, the school they attended, and in which grade of school each was. The findings did establish that the foster parents were good parents who properly raised the child. But in effecting this relationship, DHS denied the child the love and care of her natural mother.

The mother spoke Spanish only. The child spoke English only. By alienating this baby from the natural mother for five years, it caused the child to look upon her natural mother as a stranger and the foster parents as her parents. Nevertheless, Elodia sent gifts to her child on her sixth birthday. A week before trial, the child prepared a "thank you" message and mailed it to her natural mother. Among the contents of the message was the figure of a heart in which the child printed "I love you."

Elodia continuously demanded that DHS return her child. The record shows that during this five year period Elodia married.

She rose economically above the poverty stricken area and reached the subsistence level. Her contacts with her child caused the child to believe that she had two mothers; that she lived in Ruidoso with her foster parent as mother and that her natural mother lived in Alamogordo. With her level of intelligence, the child was able to grasp the idea.

True, Elodia is not capable of providing her child with the economic advantages possessed by the foster parents. But such is not the controlling factor when the very existence of a natural mother and child are at stake. "The relationship between parent and child is a bundle of human rights * * *. *Nevelos v. Railston*, 65 N.M. 250, 254, 335 P.2d 573 (1959). "[A]ll courts recognize that in determining the right to the custody of a child under adoption proceedings that the welfare and best interest of the child is not measured altogether by material and economic factors—parental love and affection must find some place in the scheme and we all know this item covers a multitude of weaknesses." *Hill v. Patton*, 43 N.M. 21, 25–6, 85 P.2d 75 (1938). See also, *Huey v. Lente*, 85 N.M. 585, 514 P.2d 1081 (Ct.App. 1973), *Hernandez*, J., specially concurring, which was adopted by the Supreme Court, 85 N.M. 597, 514 P.2d 1093 (1973).

The principle of priority of right of a parent to the custody of a child is founded upon the premise that a blood relation and instinct will cause the parent to better love and care for the child than one not so related. Out of the actual relationship of parent and child love grows. This is not to say that the product of a biological function of conception and birth always gives parents priority over the love and care of foster parents. Practical experience has often proved it incorrect. But before a reasonable judicial decision can be rendered on the subject of parental priority, the court must first determine whether the natural mother has been denied the right to foster a parent/child relationship. Until that has been done, she must not be legally adjudicated to be a non-mother.

Inasmuch as a parent/child relationship between Elodia and her child was not allowed to develop, the termination of Elodia's parental rights to her child by reason of foster care placement was erroneous.

This case is reversed and remanded to the district court to vacate its judgment and enter judgment (1) that DHS's Application to Terminate Elodia's Parental Rights is denied; (2) that such parental rights shall continue in full force and effect; (3) that custody of the child shall remain with DHS; (4) that DHS shall implement reasonable efforts that will assist Elodia to adjust those conditions which will enable her to properly care for the child and enable the child to live with her mother; and (5) within a reasonable time after appropriate efforts are carried out by DHS, a hearing be held in the district court to determine whether custody of the child shall remain with DHS in accordance with law or the child be returned to the mother.

The Department of Human Services shall pay the costs of this appeal.

IT IS SO ORDERED.

WALTERS, C. J., and DONNELLY, J., concur.